## In re Pew Memorial Trust No. 1

628

*John G. Harkins, Jr., William Carson Bodine, Francis M. Richards, Jr., Barbara W. Mather, Edward McL. Watters, III,*and *Alexander Kerr,* of *Pepper, Hamilton & Scheetz,* for petitioner.

*Henry L. King,* of *Davis, Polk & Wardwell,* and *Morris R. Brooke* and *Cuthbert H. Latta,* of *Drinker, Biddle & Reath,* for International Paper Company.

*George J. Miller, Minturn T. Wright* and *Richard L. Berkman,* of *Dechert, Price & Rhoads,* for the Dow Chemical Company.

*James W. Sutton, Jr., Deputy Attorney General,* for Commonwealth.

SHOYER, *J.,* June 30, 1977—On September 4, 1974, the Glenmede Trust Company ("Glenmede") filed its petition with this court, asking for a declaration of its rights and responsibilities in connec-

tion with the sale of 5,564,357 shares of the common stock of General Crude Oil Company ("General Crude"), pursuant to an allegedly conditional contract which it had entered into on August 16, 1974, with the Dow Chemical Company ("Dow"). Cited as respondents in addition to Dow were the Honorable Israel Packel, Attorney General of the Commonwealth of Pennsylvania as parens patriae, the General Crude Oil Company ("General Crude"), and the International Paper Company ("IP").

Petitioner is a Pennsylvania trust company and is the trustee of the Pew Memorial Trust ("Trust") under a trust indenture dated June 3, 1957.[1] The settlor of the trust was the Pew Memorial Foundation, a Pennsylvania non-profit corporation. The trust is an irrevocable perpetual trust for the exclusive benefit of charitable organizations exempt from Federal income taxation under section 501(c)(3), or successor provisions of the Internal Revenue Code.

In January, 1974, among the assets of the trust, there were 5,564,357 shares of the common stock of General Crude. Such General Crude common stock had a fair market value on August 16, 1974, of $41.25 per share. The trust's holding of common stock constituted approximately 63 percent of the outstanding common stock of General Crude. On a fully converted basis of the preferred stock into common stock, this holding would have been reduced to approximately 57 percent of the total equity of General Crude.

The background leading up to this lawsuit is briefly as follows:

The board of directors of Glenmede voted on August 16, 1974, to adopt a merger agreement by which Dow would acquire all the shares of the

common stock of General Crude held by Glenmede as trustee of the trust. The board of directors of Glenmede at the same time also voted to authorize its officers to vote its shares of General Crude in favor of the Dow-General Crude merger agreement at an indeterminate future meeting of the shareholders of General Crude.

After the board of directors of Glenmede so voted, Glenmede's officers delivered a letter to Dow adopting the Dow merger agreement and committing "subject to such obligations as may be imposed upon the trustee pursuant to the laws of the Commonwealth of Pennsylvania respecting fiduciaries," to vote the shares of General Crude in favor of the Dow merger agreement.

Prior to August 16, Glenmede had scheduled a board meeting for September 4, 1974. This was an all day meeting. After prolonged discussion, and in the face of litigation threatened by Dow, the board voted to withdraw from the Dow-General Crude merger agreement. The board then voted to sell its General Crude shares to a subsidiary of IP for $50 a share, *subject to judicial approval,* and, *on the same day,* petitioned this court for a citation to show cause why a decree should not be entered to the effect: "That Dow has no right or claim whatsoever to the General Crude stock held by Glenmede as Trustee of The Pew Memorial Trust, and no rights or claims accrue under or by virtue of Glenmede's August 16, 1974, letter to Dow, and that the sale of Glenmede's General Crude stock to IP is approved in accordance with the September 4, 1974, resolution of Glenmede's Board of Directors." This citation was served on September 5, 1974, on Dow, IP, General Crude, and the Attorney General of Pennsylvania.

A chronology of the ensuing litigious events which preceded the audit hearings commencing on July 15, 1976, is helpful at this point:

Dow brought suit in Federal Court on September 5, 1974 (E.D. Pa. Civil Action no. 74-2293) against Glenmede (in its corporate capacity and in its capacity as trustee of the Pew Memorial Trust); IP; Augustus S. Ballard, Secretary of Glenmede; Allyn R. Bell, Jr., President and a Director of Glenmede; and against Robert G. Dunlop, Howard Guess, Thomas S. Horrocks, John G. Pew, John G. Pew, Jr., R. Anderson Pew, Richard C. Sorlein and Joseph T. Wilson, Jr., Directors of Glenmede.

In its Federal action, Dow sought a declaratory judgment that the agreement between Glenmede and Dow was valid and binding, a mandatory injunction that Glenmede go forward with the Dow merger, and damages against Glenmede, the above named directors and officers, and IP, for interference with Dow's alleged contractual rights.

Next, Dow removed this present action from the orphans' court, on grounds which were subsequently found improvident by the United States District Court, which remanded the action on October 25, 1974.

Dow subsequently amended its complaint in the Federal Court, retaining its earlier request for declaratory judgment, a mandatory injunction and damages, but added claims against the trustee and certain of its officers and directors for alleged violations of the Securities Exchange Act of June 6, 1934, 48 Stat. 894, as amended, 15 U.S.C.A. §78m. The Exchange Act claims asserted were based upon representations allegedly made by officers of the trustee concerning the trustee's future course of conduct, but the remedy sought in the amended

complaint was once again specific performance of the alleged agreement between Glenmede and Dow, or its equivalent in damages.

Finally, on October 10, 1974, Dow unilaterally announced that it was "terminating" its merger agreement with General Crude.

On November 25, 1974, pursuant to a stipulation of all parties, this court entered a decree dismissing General Crude Oil Company as a respondent and approving the sale of the General Crude shares to IP at $50 per share. General Crude took no part in subsequent proceedings.

On January 15, 1975, this court, sua sponte, ordered Glenmede to file an account. The account, which was filed on March 17, 1975, shows trust assets totalling $465,394,843.55.[2]

For some 20 months, the parties were then engaged in taking the depositions of various officers and representatives of Glenmede, IP and Dow. Counsel for the parties concentrated on the preparation by intensive hammering out of a stipulation of 148 numbered facts.[3] Therein it is expressly provided: "The stipulation is entered into for the purpose of this case only and is not intended to bind any party in any other matter. Each party agrees that this stipulation is admissible as part of the record in this proceeding, but each party also reserves its rights to argue the relevance and materiality of particular paragraphs set forth below."

The stipulation was completed just prior to the commencement of hearings on July 15, 1976. The stipulations of facts and exhibits were accepted by the auditing judge and made a part of the record at the commencement of the hearing.

All parties joined in a pre-trial order which provides in part: ". . . Dow will reassert at audit its claims for damages against Glenmede and IP.

"The parties agree that the court has juridiction of all claims raised by the pleadings except for Dow's claim under section 10b of the Securities and Exchange Act of 1934. The court has decided that all issues of liability respecting these claims be tried first. Further discovery and trial relating to the causation and computation of damages have been deferred until after a determination has been made of the liability issues.

"To facilitate a trial of the liability issues, the parties have entered into the attached stipulation of admitted facts. The parties have also stipulated to the admissibility and/or authenticity of the attached list of documents for use at trial."

We will now proceed to review the pertinent facts as gained from the aforesaid stipulation of facts, the depositions and testimony of the parties, and the various exhibits which were put in evidence before the court.

Section 4942 of the Internal Revenue Code of 1954, 26 U.S.C.A. §4942, as amended, requires the trust to meet certain minimum percentage payout requirements during each year. This requirement has been made a provision of the trust indenture itself, pursuant to the Charitable Instruments Act of June 17, 1971, P.L. 181, sec. 1, 10 P.S. §201 et seq. In 1974, the aforesaid minimum percentage payout requirement was expected to *exceed* the net income of the trust by approximately $15,000,000. In succeeding years, it was averred that the minimum payout requirements were similarly expected to exceed the net income of the trust. The law requires that the deficiency in distributions must be made up from the principal of the trust. To meet this requirement, petitioner, on January 4, 1974, announced its intention of selling 500,000 shares of General Crude in a secondary offering. Due to a

decline in the market price of General Crude in March of 1974, petitioner decided to defer the secondary offering pending improvement in market conditions.

In February, 1974, petitioner was contacted by representatives of IP indicating IP's desire to acquire all of the outstanding shares of General Crude. Subsequent negotiations culminated in a proposal by IP for the purchase of the trust's shares in the context of a statutory merger of General Crude and a subsidiary of IP, pursuant to which General Crude's common shareholders would receive $45 per share in cash, or, at their option, in cash and notes, and the General Crude preferred shareholders would similarly receive $180 per share. The IP proposal was submitted to the board of General Crude on June 12, 1974, but the board did not approve the proposed merger, and instead, took it under advisement.

On July 5, 1974, a special meeting of the board of directors of General Crude was convened for the purpose of reviewing the status and evaluation of the merger proposed at the June 12 meeting of the board and to review alternative expressions of interest that had since been received by General Crude from seven other oil companies, including Dow.

On July 8, 1974, IP made an offer directly to Glenmede to purchase all Glenmede's shares of General Crude directly for $45 per share, payable 20 percent in cash and the balance in seven-year 8¾ percent installment notes, with a provision that if General Crude accepted a cash merger proposal on terms similar to those originally proposed, the payment terms of the agreement with Glenmede would be improved accordingly. This July 8 offer

was made contingent on Glenmede's acceptance thereof on the same date.

On July 8, 1974, the board of petitioner considered the new IP proposal but being unable to resolve the issue before it, the board of petitioner recessed until July 9, after receiving telephonic advice from IP that its offer would remain open until noon of July 9.

On July 9, 1974, petitioner board passed a resolution accepting the IP offer as of *August 16, 1974,* subject only to reconsideration in the event of an alternative offer from a responsible party in the sense of at least $5 more per share, provided that IP should be afforded the right to meet or better any such alternative offer. Thereupon, IP withdrew its offer on July 10. The provision concerning the right to meet or better any such offer was subsequently removed by Glenmede's board's action on July 25, 1974.

After July 10, 1974, petitioner continued its efforts to sell its General Crude stock, discussing the possible sale of the trust's interest with at least six different parties, including IP.

On August 12, 1974, Dow presented a merger proposal to the board of General Crude in which Dow offered to merge a subsidiary of Dow into and with General Crude either, (1) at an effective value of $45 per common share of General Crude ($180.6275 per preferred share of General Crude), the number of shares of Dow common to be received in such merger for each share of General Crude stock to be determined by the average price of Dow common stock during the ten trading days immediately preceding the effective date of the merger or, (2) at a fixed exchange ratio of two-thirds share of Dow common for each share of Gen-

eral Crude common, and 2.675 shares of Dow common for each share of General Crude preferred. The Dow proposal was conditioned upon action by Glenmede no later than 6:00 p.m. (EDT) on August 16, approving the proposed merger agreement and committing itself to vote its General Crude shares in favor thereof at a stockholders' meeting to be called expressly for that purpose. On August 12, the board of General Crude approved the proposed merger and accepted the fixed exchange ratio of Dow and General Crude stock.

On August 1, 1974, a special meeting of the board of Glenmede was called for the morning of August 16, 1974. On August 13, IP was advised of the scheduled meeting but representatives of IP indicated to A. R. Bell, Jr., president of petitioner, that their authority to negotiate had been terminated. However, on the morning of August 16, 1974, immediately prior to the board meeting of Glenmede, representatives of IP appeared personally and presented an offer to purchase the trust's shares of General Crude at a price of $45 per share, payable $9 (20 percent) per share in cash and the balance in a seven-year guaranteed note of an IP subsidiary, bearing interest at the annual rate of 9.5 percent per year, with annual payments of principal and semi-annual payments of interest.

This August 16, 1974, meeting of the board of directors of Glenmede was specially convened to consider the Dow proposal and such other proposals as might be brought before the board. During the course of the board's deliberations and shortly before noon, the board was advised of an increase in the IP offer from $45 to $47.50 per share of General Crude. An inquiry was promptly made of Dow as to whether it desired to submit a higher offer but Dow declined.

The trustee's board was meeting at the offices of their counsel in Radnor, Pennsylvania. Representatives of General Crude, including their president, Mr. Montague[4], and representatives of IP, including their vice-chairman, Mr. Monge, were present in the same building. The representatives of Dow, including Mr. Gerstacker, chairman of the board, Mr. Paul Oreffice, the financial adviser, and Mr. R. W. Barker, assistant counsel of Dow, were waiting in the nearby St. Davids Inn. Mr. Bell communicated with Mr. Gerstacker by telephone and after Mr. Gerstacker had received the information that the IP offer had been increased by $2.50 per share, he consulted briefly with Messrs. Oreffice and Barker. After a consultation for some 20 or 30 seconds, Mr. Gerstacker, without knowledge of the rate of interest or maturity dates provided for in the IP notes, declined to increase Dow's offer.

During the afternoon, Mr. Glanville of Lehman Brothers, investment advisers to General Crude, was invited to address the board of Glenmede in connection with the two proposals before it. Prior to August 16, 1974, Mr. Oreffice had discussed the benefits of the Dow offer with Mr. Glanville and the latter opined to petitioner's board that the trust would make out better with the merger proposal provided Dow continued to grow at its historic rate. He also warned that if it became necessary to dispose of the IP notes, they would sell at a discount and that he envisioned no "pall" over the market by reason of Glenmede having to dispose of Dow stock which he estimated had a liquidation value of $90 per share. (On August 15, Dow stock closed at $62.625 per share.) Mr. Glanville considered the credit of IP to be excellent and saw no problems if the IP notes were held to maturity. Glenmede had retained Brown Brothers Harriman & Co. for an

appraisal of the Dow proposal, then the only available offer, and the directors were advised previous to the meeting that the $45 exchange ratio alternative of Dow should be accepted over their two for three stock exchange proposal, and that in order for the Dow proposal to be competitive with IP's proposal, in the sense of meeting the trust's liquidity problems, Dow's stock would have to appreciate *substantially*. Eleven members of the board of directors of Glenmede were present. The remaining member, Robert G. Dunlop, was in London but Messrs. Ballard and Bell had talked to him by telephone on August 14 and 15. Mr. Dunlop expressed the opinion that the exchange ratio of two Dow shares for three shares of General Crude was unacceptable to him and that the previous IP offer was better than the present Dow offer.

Discussion being had between eleven members of the Glenmede board as to the merits of the competing proposals, a resolution was moved and seconded that the board accept IP's $47.50 proposal. Five directors voted in favor of the motion and six directors, including John G. Pew, Sr., John G. Pew, Jr., J. N. Pew, III, and Mrs. Wister (a member of the Pew family) voted against the motion. Mr. Bell announced that the motion had failed to pass by a vote of five to six. Thereafter, Mr. J. N. Pew, III, moved that the terms and conditions of the Dow agreement and plan of merger of August 12, 1974, be approved by Glenmede as trustee of the trust and that Glenmede commit itself to Dow to vote the shares of General Crude common stock held by the trust in favor of approval of the Dow agreement and plan of merger at the special meeting of General Crude to be called to consider the merger agreement. This motion was seconded by John G. Pew,

Sr., and there were eight votes in favor of the motion and three directors voted against the motion. Thereafter, on motion duly made and seconded, the Glenmede board voted unanimously for the exchange ratio of Dow common stock worth $45 per share of General Crude common stock.

Following these decisions, the Glenmede board meeting of August 16 adjourned at approximately 4:00 p.m., and the members of the board left the meeting area.

## I. FINDINGS OF FACT—SOME STIPULATED—SOME ADOPTED

Paragraph No. 80 of the stipulation of facts reads as follows:

"Most of the events of August 16th following the adjournment of the meeting of Glenmede's Board of Directors have not been stipulated and will be the subject of proof. It is stipulated, however, that some time after the adjournment of this meeting, at 4:00 P.M. but before 6:00 P.M., the following occurred:

"Representatives of Glenmede, including Messrs. Bell and Ballard met with representatives of IP, including Mr. Monge, and *discussed $50.00* per share in cash and notes for the Trust's shares of the common stock of General Crude. Whether there *was an offer of $50.00* per share made by IP *at that time is disputed by Dow.*

"Thereafter, Messrs. Bell and Ballard met with Messrs. Gerstacker, Oreffice and Barker of Dow and delivered to them a letter dated August 16, 1974 (Trial Exhibit 54) (hereinafter 'Glenmede's August 16 letter') and a Secretary's Certificate reflecting the Glenmede Board's resolutions. (Trial Exhibit 56.) Mr. Ballard also referred to the *prior*

*discussion* with IP about *$50.00 per share.* The Glenmede August 16th letter stated:

" 'Please be advised that at a special meeting today at which a quorum was at all times present and voting, the Board of Directors of the Glenmede Trust Company, Trustee for the Pew Memorial Trust, duly adopted the terms and conditions of the Agreement and Plan of Merger dated August 12, 1974, among the Dow Chemical Company, GCO Merger Corporation and General Crude Oil Company on condition that the exchange ratios provided for in Section 2.1 thereof be amended so that on the effective date of the merger each share of General Crude common stock and General Crude preferred stock shall be exchanged for the number of shares of Dow Chemical common stock equal in value to $45.00 per share of General Crude common and $180.5625 per share of General Crude preferred stock determined on the basis of the average of the high and low prices for Dow common stock for each of the ten trading days on the New York Stock Exchange ending on the trading day immediately preceding the closing date set forth in the Agreement and Plan of Merger.

" 'Subject to the *aforesaid amendment* of the exchange ratios, and *subject to such obligations as may be imposed upon the Trustee pursuant to the laws of the Commonwealth of Pennsylvania respecting fiduciaries,* the Glenmede Trust Company in its capacity as Trustee of the Pew Memorial Trust hereby commits to the Dow Chemical Company that the shares of General Crude Oil Company common stock owned of record by Glenmede *will be voted* in favor of approval of the said Agreement and Plan of Merger at the *special meeting* of the General Crude stockholders *to be called* for that purpose.' " (Emphasis supplied.)

Counsel for Glenmede, with their post-trial memorandum, have submitted numerous proposed findings of fact and the auditing judge, having satisfied himself that they are amply supported by a preponderance of the credible evidence, hereby adopts the following as his findings:

"80a. Following the adjournment of the Glenmede Board meeting at approximately 4:00 P.M., August 16, 1974, Messrs. Ballard and Bell informed the IP representatives of the Board's decision, and then excused themselves in order to prepare the formal written commitment to Dow required by both the August 12th letter agreement between General Crude and Dow and the final resolution of the Glenmede Board on August 16, 1974. (Tr. 633-34, 784-85; Exs. 35, 48, 53; Bell dep. at 130-33; Flom. dep. at 19; Greenhill dep. at 72; Monge dep. at 107-09.)

"80b. Shortly thereafter, Mr. Monge asked to see again the Glenmede representatives, Messrs. Ballard, Bell and their counsel. In the interim, Mr. Monge had ascertained that Glenmede had not yet delivered its written commitment to Dow. When the Glenmede representatives and counsel returned, Mr. Monge announced that he understood the trust was not bound and that he was *then and there* raising IP's offer to $50.00 for each share of General Crude common stock held by the trust. When he was informed that the Board had dispersed and there was no authoritative body to receive the offer, Mr. Monge said he would confirm the $50.00 offer in writing by 9:00 A.M., Monday, August 19, 1974.[5] (Tr. 634-35, 788-90; Ex. 53; Greenhill dep. at 74-75; Flom dep. at 26-27; Monge dep. at 119-20; Bell dep. at 138-39; Ballard dep. at 131, 139, 145, 179-83.)

"80c. Following communication of the IP offer, Glenmede's representatives, Messrs. Bell and Ballard, met with those counsel for Glenmede who were present in Radnor to analyze the problem created by IP's increased offer. The Glenmede representatives had been instructed by their Board to accept the Dow offer in writing by the deadline of 6:00 P.M., and yet prior to that deadline and prior to any written acceptance, IP had announced a $50.00 offer and promised to confirm that offer promptly in writing. The trust representatives and counsel determined that they could not then and there resolve the legal dilemma created by the instructions and the $50.00 offer, but determined that they were required to follow the Board's instructions by communicating its decision to Dow and were also required to put Dow on notice of IP's announcement of a $50.00 offer, and the fact that the increased IP offer might cause fiduciary problems for Glenmede which could not be researched in the time available. Specific reference was made to the repeal of the 1945 provision concerning the certainty of contracts for the sale of a trust asset by a trustee. (Tr. 636; Exs. 50, 53; Bell dep. at 145-50; Ballard dep. at 139-42.)

"80d. When the draft of Glenmede's conditional commitment was prepared, including the insertion of the 'subject to' language, the Dow representatives were asked to come to the offices of Pepper, Hamilton & Scheetz in Radnor. Mr. Ballard and Mr. Bell met with Messrs. Gerstacker, Oreffice and Barker and distributed to them copies of the commitment letter and Secretary's certificate. Mr. Ballard took pains to draw the attention of the Dow representatives to the 'subject to' language and to explain to them that it had been inserted in the light

of Mr. Monge's announcement of an IP $50.00 offer for the trust's shares and because Dow was dealing with a fiduciary which might be subject to special obligations under the circumstances. He also explained the situation concerning the repeal of the 1945 Act, and the failure to re-enact a key portion of it in the recodification. Mr. Ballard indicated to the Dow representatives, including Dow's counsel, Mr. Barker, that Glenmede's counsel had not had any opportunity to research the issues, could give no guarantee as to the binding nature of the commitment, and did not know whether the trust would be required to consider the IP offer. (Tr. 636-37, 640-43, 712; Exs. 50, 53; Bell dep. at 154-57; Ballard dep. at 146-58.)

"80e. Mr. Gerstacker did not hear the discussion between Messrs. Ballard and Barker concerning the IP $50.00 oral offer and the problems with the 1945 Pennsylvania statute. (Tr. 77-79, 148-50, 159-60.)

"80f. The only person who indicated to Mr. Gerstacker that Dow might have a 'binding agreement' was Mr. Barker. Mr. Ballard and Mr. Bell said nothing after having fully explained the situation to Mr. Barker. (Tr. 78-79.)

"80g. Dow had knowledge of IP's $50.00 oral offer, to be confirmed in writing, prior to Glenmede's execution and delivery of Glenmede's August 16, 1974, letter, and prior to Dow's receipt of the letter.[6] (Tr. 199; Ex. 54.)

"80h. Mr. Gerstacker and other Dow representatives, including Mr. Barker, at all material times, knew that Dow, in dealing with Glenmede, was dealing with a fiduciary. Dow was expressly reminded of Glenmede's fiduciary status by Glenmede representatives on August 16, 1974, prior to

Glenmede's execution and delivery of its August 16, 1974, letter. (Tr. 34-35, 199; Exs. 53, 54.)"

Some of the additional findings of fact requested by Glenmede are also adopted by the auditing judge and are set forth in the annexed footnote,[7] not because they are any less vital or relevant, but for the sake of brevity.

We may now consider the issues: (1) was Glenmede's acceptance letter unconditional and enforceable; (2) was Glenmede as a fiduciary still bound to accept a better offer; (3) did Glenmede act properly in seeking a ruling from the orphans' court; (4) was IP's $50 bid a superior offer; (5) has Dow's conduct in (a) voluntarily and unilaterally terminating its General Crude merger agreement and (b) violating the Federal Securities Exchange laws invalidated its claim for damages against Glenmede and/or IP?

Dow, having abandoned all claims to the General Crude stock, now appears at the audit of the Glenmede account as a claimant for damages (compensatory and punitive) for breach of an "agreement." The burden is on Dow to prove its case which it rests on the letter of August 16 as being a binding commitment. In its original answer in this proceeding, Dow claimed that on August 16, 1974, it made an unconditional agreement with Glenmede calling for Glenmede to vote the trust's shares of General Crude in favor of a proposed Dow-General Crude merger. Dow claimed that Glenmede, its officers (Messrs. Bell and Ballard), and IP "caused Glenmede to breach its agreement," thus becoming liable for "tortious interference" (¶¶1-3, & 11 of "Counterclaims (New Matter) contained in Dow's answer to Glenmede's petition).

In any matter where a claim is being made

against an estate or trust, the burden of proof to establish the claim is on the person or persons objecting to the transaction or to the account of the fiduciary: Moore Estate, 439 Pa. 578, 583, 266 A. 2d 641, 643 (1970); Dixon Estate, 426 Pa. 561, 562, 233 A. 2d, 242, 244 (1967); Petro v. Secary Estate, 403 Pa. 540, 542-543, 170 A. 2d 325, 326-327 (1961); Cameron Estate, 388 Pa. 25, 28, 130 A. 2d 173, 175 (1957); Winsmore's Estate, 325 Pa. 303, 304, 190 Atl. 892 (1937); Donlevy's Estate, 323 Pa. 173, 176, 185 Atl. 740, 742 (1936). See, generally, 3 Partridge & Remick, Pa. Orphans' Court Practice, §22.02, at 132-33 (1962). In Dixon Estate, supra, p. 562, the court said: "In any contract action, including actions against an estate, the claimant bears the burden of proving the terms of the contract."

The "agreement" upon which Dow relies is, of course, the letter delivered by Glenmede to Dow on the evening of August 16 (Exhibit J to Glenmede's petition; Trial Ex. 55). Dow acknowledges in its pleadings that there was no contract of any kind between Glenmede and Dow until this document had been executed and delivered. Dow has alleged that Glenmede ". . . accepted Defendant's [Dow's] proposal at its Board Meeting on August 16, 1974, and communicated that acceptance to Defendant by letter, a copy of which is Exhibit J. to the Petition." (Answer of the Dow Chemical Company to the Petition of Glenmede Trust Co., New Matter ¶1) As a matter of law, no contract could arise between Glenmede and Dow until Glenmede's acceptance of Dow's offer had been communicated in the authorized manner to Dow: Bershad v. Chester Nest No. 1228, Order of Owls of Chester, 364 Pa. 393, 395, 72 A. 2d 116 (1950) ". . . there is nothing . . . to show

that the acceptance was transmitted to plaintiff by an authorized agent of defendant." Merchants' Warehouse Co. v. Hitchler, 335 Pa. 465, 7 A. 2d 455 (1939); Warner Bros. Theatres, Inc. v. Proffitt, 329 Pa. 316, 319, 198 Atl. 56 (1938). "The acceptance of an offer, to be effective, . . . must be transmitted to the offeror." Morganstern Electric Co. v. Coraopolis Borough, 326 Pa. 154, 157, 191 Atl. 603 (1937) "It is elementary that no obligation is created by the acceptance of an offer unless and until it is transmitted to the offeror." Groskin v. Bookmyer, 310 Pa. 588, 196 Atl. 233 (1933); Munhall v. Travelers Ins. Co., 300 Pa. 327, 150 Atl. 645 (1930).

In giving examples of the application of this principle of law, Professor Corbin, in his treatise, Law of Contracts §67, 280, describes two situations, very much in point here, involving acceptances by votes of boards of directors: "A subscription for shares probably cannot be accepted merely by passing a vote of the board of directors and entering the vote on the minutes of the corporation . . . For similar reasons, it has been held that the vote of an official board to accept a bid is not operative as an acceptance; it must be officially communicated." (Footnotes omitted.)

## II. GLENMEDE'S AUGUST 16 COMMITMENT WAS BOTH CONDITIONAL AND VOIDABLE.

After careful and intensive consideration of the events which preceded Glenmede's preparation of its "subject to" letter of August 16, 1974, and terminated with the delivery of the same to Dow's representatives on the same date, we are impelled to the conclusion that whatever obligations were created by the letter were unenforceable or voidable for any and all of the following reasons: (1)

Dow's knowledge of the higher IP $50 offer meant Dow was not a good faith purchaser and could not enforce the August 16 letter; (2) Glenmede's acceptance was expressly made "subject to" the trustee's fiduciary obligations, and hence, in light of IP's higher $50 offer and in light of the then existing absolute repeal of the 1945 act providing for finality of fiduciaries' contracts, it was either a conditional acceptance revocable in light of Glenmede's obligations or a counter offer which Dow did not accept; (3) several Glenmede Board members who had voted against the IP offer and in favor of the Dow $45 stock offer at the August 16 meeting, had such a substantial personal interest in the transaction that the appearance of a conflict was created; and (4) Dow had, alone and with General Crude, committed several violations of the Securities Laws which entitled Glenmede to rescind.

Our finding of fact no. 80g establishes that Dow did have knowledge of the IP $50 offer prior to the delivery of the August 16 letter. Under the controlling legal standards of Heilig Bros. Co., Inc. v. Kohler, 366 Pa. 72, 76 A. 2d 613 (1950), Dow's knowledge that it was dealing with a fiduciary and that a higher offer was at least available, precludes Dow from claiming under the agreement as a bona fide purchaser. In Heilig, the court recognized county commissioners as fiduciaries. When these commissioners sold land to a low bidder, the court held that the buyer knew that it was dealing with a fiduciary and that under Pennsylvania law, it is the duty of a fiduciary to obtain the highest price for the sale of a trust asset. Therefore, the buyer was not a bona fide purchaser and its contract was not enforceable.

The testimony at trial, plus the depositions and

the exhibits, have made crystal clear to the auditing judge the reasons for the insertion of the "subject to" language in Glenmede's letter to Dow. Mr. Bell's testimony, Mr. Ballard's memorandum, and most importantly, Mr. Barker's memoranda written after the commencement of litigation, all agree that Glenmede's action was "without researching the law" and, hence, "no guarantee" could be given as to the binding nature of the commitment: (Tr. 640-43, 712; Exs. 50, 53.) The August 16 letter used conditional language so that, as Mr. Bell testified, Glenmede could "lay its cards on the table with Dow," both with respect to the higher IP offer and the fiduciary problems which might thereby arise: (Tr. 636.) Even then, one specific fiduciary issue was called to Dow's attention, namely, the problem posed by the repeal of the 1945 act. (Tr. 636.)

A conditional acceptance does not give rise to an enforceable obligation: Hedden v. Lupinsky, 405 Pa. 609, 176 A. 2d 406 (1962); Cohn v. Penn Beverage Co., 313 Pa. 349, 169 Atl. 768 (1934); 1 Corbin on Contracts, §82, at 349-52 (1963). See, generally, Restatement, 2d, Contracts, §§59-60 (Tent. draft No. 1, 1964).

President Bell and secretary Ballard were properly concerned over the turn of events which had occurred prior to their preparation of the formal commitment to Dow. Mr. Monge, vice-chairman of IP, had made a definite offer of $50 a share, some $14,000,000 more than his offer at $47.50. The offer was oral but he had promised to put it in writing no later than the following Monday morning. Messrs. Bell and Ballard knew that an oral offer is valid and Dow's Mr. Barker concedes as much. Glenmede's two officers were also fully aware of their responsibility as trustees of a charitable trust.

It was their duty to obtain the best of the two competing offers for the trust. The gap in the Probate, Estates and Fiduciaries Code of June 30, 1972, P.L. 508, was also a matter of deep concern because no one had yet had an opportunity to research the matter thoroughly. The Act of May 24, 1945, P.L. 944, sec. 1, 20 P.S. §818, had drastically changed the common law rule as to a *fiduciary's* contractual obligations. The act read as follows:

"When a fiduciary [by definition the term includes both trustees and personal representatives] shall hereafter make a contract not requiring approval of court, or when the court shall hereafter approve a contract of a fiduciary requiring approval of court, neither inadequacy of consideration, nor the receipt of an offer to deal on other terms shall, except as otherwise agreed by the parties, relieve the fiduciary of the obligation to perform his contract or shall constitute ground for any court to set aside the contract, or to refuse to enforce it by specific performance or otherwise: Provided, That this act shall not affect or change the inherent right of a court to set aside a contract for fraud, accident or mistake."

Prior to the passage of the Act of 1945, Pennsylvania followed the common law to the effect that, even if a fiduciary has signed an agreement of sale, he must withdraw from that agreement if title has not yet passed, or if the agreement is still in the stage of an executory contract, and then a higher offer becomes available: Herbert Estate, 356 Pa. 107, 51 A. 2d 753 (1947); Brereton Estate, 355 Pa. 45, 48 A. 2d 868 (1946); Warfel Estate, 417 Pa. 458, 461, 209 A. 2d 293 (1965); Titus v. Smith, 59 D. & C. 2d 150, 153 (1972).

The Pennsylvania legislature, in enacting the Probate, Estates and Fiduciaries Code (effective July 1, 1972), had specifically repealed the Act of 1945. See Act of June 30, 1972, P.L. 508, section 3(a)—Repeals. At the same time, in preparing its codification, it had retained the provisions of the act in listing the powers of a "personal representative": 20 Pa.C.S.A. §3360(a). By definition (see §102), "personal representative" means "an executor or administrator of any description" but does not include a "trustee" as in the more inclusive term "fiduciary." When the code set forth the powers of a trustee, however, in chapter 71, trusts, subchapter E, §7133, it failed to include the 1945 specifications as to a binding commitment. That this was an oversight on the part of the legislature has now been established by the passage of the Act of December 10, 1974, P.L. 867, 20 Pa.C.S.A. §711 et seq., sec. 20(b), which is expressly made retroactive. However, on August 16, 1974, the "gaposis," as Mr. Ballard called it, existed, and to the trustee was very real. Clearly, the oversight could not be corrected by this or any other court. While the oversight might be obvious, nevertheless the legislature had "absolutely" repealed the Act of 1945, and no court on September 4, 1974, had the power to step in and perform what was clearly the prerogative and responsibility of the legislature: Com. v. Flashburg, 237 Pa. Superior Ct. 424, 352 A. 2d 185 (1975); Greenfield v. Dusseault, 38 N.J. 78, 161 A. 2d 475 (1960); Saslow v. Previti, 3 A. 2d 811 (N.J. 1939); Reaney v. Union County, 10 N.W. 2d 762 (S.D. 1943); Orton v. Adams, 21 Utah 2d 245, 444 P. 2d 62 (1968).

In the discussion with Dow contemporaneously with the delivery of the August 16 "subject to"

letter, Messrs. Bell and Ballard, knowing of the absolute repeal of the Act of May 24, 1945, and the legislative omission in the recodification of any statutory provision making the new codification applicable to trustees, could only presume that the pre-existing common law rule was, on the face of the situation, reinstated. Mr. Miller, counsel for Dow, suggests that this court should adopt some intermediate rule, but he does not suggest what that might be. So firmly embedded in the case law of this Commonwealth was the common law rule that a fiduciary must obtain the highest price, that we are convinced that as of the date of the repeal of the 1945 act, this old common law rule was revived.

In Herbert Estate, 356 Pa. 107, 51 A. 2d 753 (1947), the history of the common law rule is reviewed and many of the important cases in Pennsylvania are cited. Thus, we read at page 109:

"This case arose before the passage of the Act of May 24, 1945, P.L. 944, which, according to its express provision, became effective only upon its enactment. The present controversy, therefore, as is admitted by all the parties, must be adjudicated under the decisional law as it existed prior to the enactment of that statute. By a continuous line of decisions stemming from Dundas's Appeal, 64 Pa. 325, extending through Orr's Estate, 283 Pa. 476, 129 A. 565; McCullough's Estate, 292 Pa. 177, 140 A. 865; Clark v. Provident Trust Co. of Philadelphia, 329 Pa. 421, 198 A. 36, and culminating in Kane v. Girard Trust Company, 351 Pa. 191, 40 A. 2d 466 (see also Brereton Estate, 355 Pa. 45, 51, 48 A. 2d 868, 870, 871), it was consistently held that, where such a fiduciary had agreed to sell property, he not only could, but must, repudiate the

agreement at any time before final settlement and conveyance of the title if he received an offer for the property substantially higher than the price for which he had originally contracted to sell it. It was said in McCullough's Estate, supra, (p. 181, A. p. 866): 'It is not what was or what could have been obtained for the property, but what can be obtained for it that is the determining factor.' It was not merely a *power* on the part of the fiduciary but a *duty* to dispose of trust property upon the most advantageous terms which it was possible to secure for the benefit of the estate, irrespective of the fact that a prior agreement which was being superseded might have been entered into by him in the utmost good faith and for what appeared at the time to be a fair and adequate consideration. . . . In Kane v. Girard Trust Co., supra, it was held to be mandatory upon the trustees to accept a higher offer for the trust real esate even though made at almost the very last moment when the deed was being conveyed to an earlier purchaser. It was said in that case (p. 197, A. p. 469): 'Our decisions show conclusively that title must pass to the buyer in a matter of this kind before a fiduciary is relieved of the duty to accept a higher bid for trust property. There must be a consummated sale. Until title actually passes the property is a trust asset, and, so long as it forms part of the corpus of a trust, the trustees must get the highest price obtainable for it. . . . Legal title passes only with the delivery of the deed, and until then the trustee is bound to accept the best offer made for the property.' And in Brereton Estate, supra, it was pointed out (p. 51, A. p. 871) that this 'principle had become a rule of property, a part of the substantive law, applied in all courts and not in the orphans' court alone.'

"In the present case the legal title had not passed to plaintiff at the time when defendants received the higher bid from Gulack; indeed, it is that title that plaintiff is now seeking to obtain. How does he attempt to overcome the principle pertaining to sales by fiduciaries which was so firmly imbedded in our law? He maintains that at the auction sale Gulack had the same opportunity to bid as plaintiff or anyone else and therefore his higher offer made at a later time should not be recognized. But in the sale of trust property it was not the bidders for whom the law had concern but the interests of the beneficiaries in order to secure for them the highest obtainable return. . . . The successful bidder at an auction sale does not obtain a legal title merely by reason of having the property knocked down to him; such a title can result only from the execution and delivery to him of a deed of conveyance; what he does acquire is only the same equitable title which every vendee obtains by virtue of his agreement. 'The vendor and vendee, upon the acceptance of the latter's bid at an auction, occupy the same relation toward each other as exists between the promisor and promisee of an executory contract of sale conventionally made. . . . The general rules with regard to the passing of title in the case of ordinary sales are applicable': 5 Am. Jur. 474, 475, section 41. The rule that the title to property sold does not pass to the purchaser until the price is paid, or a deed or bill of sale executed, or delivery made, applies to auction sales as to all others. . . .

"Since a purchase at auction sale gives rise merely to an *executory* contract under which the purchaser obtains no greater right or title than does any vendee under a private agreement, it follows that the rule of Kane v. Girard Trust Co., 351 Pa.

191, 40 A. 2d 466, applies, namely, that until the legal title is conveyed the fiduciary is bound to accept a higher bid, even though no fraud or impropriety was involved in the original sale . . ." (Emphasis in original.)

The auditing judge is supported in this ruling by Binenstock Trust, 410 Pa. 425, 190 A. 2d 288 (1963). That decision indicates the continuing viability of the higher offer principle even in the face of the Act of 1945 if there is any "opening" in the contractual obligation which would justify subjection of the contractual obligation to the higher offer principle. The court said in Binenstock at p. 432:

"Also, the Act of May 24, 1945, did not prevent the court below from considering the possibility of higher offers for the Dougherty stock. That act, which was passed to protect persons purchasing from fiduciaries, specifically excludes from its coverage 'contracts . . . requiring the approval of the court,' as this one did. In such a situation, the purchaser should realize that the judgment of the orphans' court having been invoked, that court must consider the best interests of the trust, including the possibility of higher offers for the trust property."

It is true that here the August 16 letter did not say "subject to the approval of the Orphans' Court." However, in view of the explanation which was offered to Dow by the Glenmede representatives, we regard the "subject to such obligations as may be imposed upon the trustees pursuant to the laws of the Commonwealth of Pennsylvania respecting fiduciaries" as the equivalent of "subject to the approval of the Orphans' Court."

## III. GLENMEDE ACTED PROPERLY IN SEEKING ORPHANS' COURT APPROVAL OF ITS SALE OF THIS VERY SUBSTANTIAL TRUST ASSET.

Although Mr. Gerstacker, acting on the advice of his attorney, Mr. Barker, may have thought that the August 16 letter was a binding agreement, the "subject to" language definitely made it a conditional acceptance. The problems facing the trustee were complex.[8] The amount at stake, in excess of $250,000,000 allowed for no mistake in judgment on the part of the trustee. The advice of counsel was to seek the approval of the orphans' court. IP expressly agreed to the trustee coming to this court and although Dow made no such concession, nevertheless, Dow realized that, should the decision of the court be in favor of the Dow offer, the trustee would then be obligated to observe the Dow agreement to the letter.

Our Pennsylvania Supreme Court, in Evans v. Goodwin, 132 Pa. 136, 144, 19 Atl. 49, 52 (1890), quoting from Adams on Equity, §59, stated: "'If in any case there is a *bona fide* doubt as to the course which under the circumstances a trustee should pursue, he may obtain directions by a suit in equity at the cost of the estate. And a cautious trustee will generally do so whenever a reasonable doubt exists." And, similarly, III Scott, The Law of Trusts, §201, at 1651 (3d ed. 1967), states:

"Where the trustee makes a mistake of law as to the extent of his duties or powers as trustee, it is no defense that he relied upon the advice of an attorney. . . . The subjection of a trustee to liability where he is not at fault in making the mistake may

seem harsh. He can, however, escape liability by submitting the matter to the court for its instructions. If he is in doubt as to his duties or powers, he can thus avoid the risk of acting on his own opinion or on that of his attorney."

In Pennsylvania Co. v. Wilmington Trust Co., 186 A. 2d 751, 774 (Del. Ch. 1962), aff'd. sub. nom., Wilmington Trust Co. v. Coulter, 200 A. 2d 441, 449, 454 (Del. 1964), the court dealt with a situation similar in many respects to that facing Glenmede here. In Wilmington Trust Co., the trustees were attempting to dispose of their holding of 82 percent of the stock of a small railroad corporation. Negotiations were undertaken with several different parties for the sale of the trust's entire holding. The trustee had rejected offers from the Minneapolis and St. Louis Railway (Minneapolis) in the range of $70 to $80 per share. Subsequently, on April 15, the corporate trustee alone entered into a contract with the Pennsylvania Railroad and the Santa Fe Railroad to sell each 26 percent of the stock at $100 per share. The agreement was made subject to the approval of the boards of the purchasing railroads and the ICC. On April 22, Minneapolis made an offer to the corporate trustee to buy all the stock $133 per share. At this time, neither of the boards of the purchasing railroads had approved the agreement nor had the individual trustee's required consent been obtained. On April 27, the boards of the railroads and the individual co-trustee (without knowledge of the $133 offer), approved the written agreement. At that point, Minneapolis communicated its offer directly to the beneficiaries of the trust who pressured the trust company to withdraw in order to accept this one-third higher offer. On May 26, the corporate trustee

withdrew from the April 15 agreement and agreed to accept the Minneapolis offer unless a better offer was received. Santa Fe subsequently made such an offer and purchased all the trust's stock at $135 per share.

The Supreme Court of Delaware found that a breach of trust had been committed by the corporate trustee in failing to determine whether the April 15 agreement was binding upon receipt of the higher offer by at least consulting with counsel, as well as in failing to inform the individual co-trustee of the existence of the higher offer.

The corporate trustee attempted to argue that it may have had a binding agreement on April 15; indeed, the Pennsylvania Railroad had at all times insisted that the April 15 agreement was a binding commitment. The corporate trustee further argued that it would have been improvident to withdraw from a certain sale in order to attempt to consummate a sale at a higher price when that offer was subject to the approval of the Board of Directors of Minneapolis. The Supreme Court of Delaware held that the trust company's contention might not have been without merit, but that its failure either to communicate the higher offer to its co-trustee or to seek the advice of its counsel to examine the various possibilities, was sufficient to amount to a breach of trust. See also Restatement, 2d, Trusts, §259.

Section 4 of the Pennsylvania Declaratory Judgments Act of June 18, 1923, P.L. 840, 12 P.S. §§831 et seq., represents a recognition by the drafters of the Uniform Act that the area of trust administration is particularly susceptible and amenable to declaratory relief. The section provides, in relevant part: "Any person interested, as or through an executor, administrator, trustee, guardian, or other

fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust, in the administration of a trust . . . may have a declaration of rights or legal relations in respect thereto . . ."

Section 3 of the Declaratory Judgments Act provides that a contract may be construed either before or after there has been a breach: 12 P.S. §833. In like vein, §3353 of the Probate, Estates and Fiduciaries Code, provides that whenever "it is advisable that a sale have the effect of a judicial sale, [the trustee] may sell any real or personal property of the estate . . . at public or private sale . . . under order of the orphans' court division of the county . . . whenever the court shall find such sale . . . to be desirable for the proper administration and distribution of the estate."

Case law in Pennsylvania establishes that the orphans' court will not give an advisory opinion as to the sale or purchase of an asset. To create a justiciable issue, it is necessary that the trustee first make a commitment and then submit the transaction to the orphans' court for its approval or disapproval: Carwithen's Estate, 327 Pa. 490, 194 Atl. 743 (1937); Kittredge Trust, 20 D. & C. 2d 611, 10 Fiduc. Rep. 403 (O.C. Phila. 1960); and Kittredge Trust (No. 2), 12 Fiduc. Rep. 190 (O.C. Phila. 1962). This is exactly what the Board of Trustees of the Pew Memorial Trust did on September 4. They first wiped the slate clean of the action which they had taken on August 16 to commit themselves to vote for the Dow merger agreement. Then, *after much discussion* and *subject to the approval of the orphans' court,* they compared the Dow offer of $45 with the IP offer of $50 and voted to accept the latter. Clearly, in so doing, they were carrying out their duty as trustees

of a charitable trust, and if Dow, in the interim, had indicated any desire to better its original offer, it would have been heard. Instead, Dow, still seeking a "pooling of interest" and fearing that it had already bargained away more of its stock than it had anticipated, preferred to stand pat. A suit for damages which their officers discussed on August 31, 1974, appeared to be the more desirable choice. (Tr. 386; Ex. AA.)

Dow's conduct from the time when it entered the picture in June of 1974 (Trial Ex. 21, pp. 9-10), until its official withdrawal on October 9, 1974, warrants careful study and analysis. Prior to Dow's entry on the scene, Glenmede had considered a proposal from IP to acquire the trust's General Crude shares for $45 per share via an IP-General Crude merger and had found this proposal to be acceptable. (Stip. ¶26) In light of the inaction of General Crude's board of directors on IP's merger proposal, Glenmede and IP had transformed the proposed transaction into a direct purchase by IP of the trust's General Crude shares for $45 per share. (Stip. ¶29.)

Dow began its pursuit of General Crude on the eve of final action by Glenmede's board of directors regarding this direct purchase transaction. Dow's first step was to "fend off" an acceptance by Glenmede of IP's offer to purchase the trust's shares for $45 a share. (Trial Ex. C; Tr. 324 [Barker].) After succeeding in this initial goal, when the Glenmede board on July 9 accepted IP's offer only on a conditional basis (Stip. ¶36), Dow then sought to meet (but not beat) the terms of IP's $45 offer.

Dow never intended to offer more than $45 for the trust's General Crude shares. Dow's *admitted* strategy was not to offer better terms to the trust than IP had offered but rather to secure acceptance of a Dow proposal by making a tax-free and thus

more attractive proposition to the management and other shareholders of General Crude who would, in the event of a cash sale to IP, be liable to pay substantial capital gains taxes. This was made unmistakably clear by Mr. Oreffice, Dow's financial vice-president, who described Dow's intentions succinctly as follows: ". . . We zeroed in *not* on trying to find what a fair price might be, but could we offer $45 worth in some way to make it nontaxable." (Emphasis supplied.) (Oreffice dep. 37.)

Except for one meeting on July 11, 1974, Dow made no attempt to negotiate with the trust. While IP negotiated directly with Glenmede for the purchase of the trust's General Crude shares, Dow conducted its negotiations exclusively with General Crude. (Tr. 194 [Barker]) Dow came to Glenmede only after the basic terms of a proposed merger between Dow and General Crude had been agreed upon by Dow and General Crude and only because an affirmative vote of the trust's shares was necessary to effectuate that merger.

Such relationship as Dow had with the trust was based not upon making an offer better than IP's for the trust's assets but upon persuading the trust to go along with what the management of General Crude wanted. Thus, when IP openly offered higher prices ($47.50 and later $50) for the trust's shares, Dow declined to match any higher offer, relying upon its ability (with the assistance of General Crude's management and certain directors of Glenmede who owned General Crude shares themselves) to persuade Glenmede to accept a lower Dow proposal because it was allegedly in the interest of the other shareholders of General Crude. (Ex. 52, p. 3; Gerstacker dep. pp. 57, 162; Oreffice dep. pp. 152, 188.) Thus Dow (and General Crude as

well) throughout Dow's entire negotiations, showed itself completely oblivious of Glenmede's fiduciary responsibility as a vendor, or else deliberately chose to ignore the same.

## IV. GLENMEDE'S AUGUST 16 LETTER TO DOW WAS A PRODUCT OF SELF-DEALING BY CERTAIN GLENMEDE DIRECTORS

The action of the Glenmede board in voting (6-5) to reject the IP $47.50 offer on August 16 was a result of the votes of three Glenmede directors— John G. Pew, Sr., John G. Pew, Jr., and Joseph N. Pew, III—who had conflicts of interest. Each of these persons, or his immediate family, owned a substantial number of shares of General Crude common stock, and they stood to avoid substantial immediate capital gains taxes if the IP offer was rejected in favor of the Dow proposal.

John G. Pew, Sr., personally, held over 44,000 shares of General Crude common stock (Stip. ¶9), his brother and sister each held approximately 22,000 shares (John G. Pew, Sr., dep. p. 24). Joseph N. Pew, III, and his immediate family also held over 8,000 shares. If Glenmede had accepted the IP proposal, these persons faced substantial capital gains tax liability (John G. Pew, Sr., dep. p. 26). John G. Pew, Sr., and Joseph N. Pew, III, were aware of the conflict caused by their personal and family holdings of General Crude. Mr. Ballard had advised John G. Pew, Sr., to abstain from voting in transactions involving the sale of the trust's General Crude shares (Ballard dep. pp. 20-23; J. N. Pew, III, dep., pp. 40, 45, 46). J. N. Pew, III, had learned of this advice as well (J. N. Pew, III, dep. p. 39). In contrast, Mr. Ballard had advised Mr. Bell

that the 200 shares of General Crude common stock owned by him were such a minimal number that Mr. Bell was not thereby disqualified (Ballard dep., pp. 18-19).

Glenmede does not contend that any Glenmede director when voting on August 16, 1974, acted because of any improper motive or self-interest. However, the depositions taken from the three above named and other members of their family who are directors show that they felt a deep sense of loyalty to the employes of General Crude with whom they had been associated for some 30 years. Despite Mr. Ballard's advice that so long as IP was giving the same price to the other shareholders as it was giving to Pew Memorial Trust, the directors had done all that they should for the sake of these other shareholders, and should put the interest of the charitable trust first, these directors did, despite Mr. Ballard's advice, vote in favor of the Dow offer. The trait of loyalty to one's friends has always been highly regarded as one of the finest of human virtues. Nevertheless, loyalty to one's trust must rise above the bonds of friendship. As we said in Curtis Trust, 45 D. & C. 2d 701, 714 (1968): "In the matter of self dealing a trustee cannot wear the halo of fiduciary rectitude without donning the robe of inflexible loyalty."

The prohibition against self-dealing is absolute. Self-dealing by a fiduciary is not limited to a sale of trust assets to himself but includes any situation in which a trustee has a substantial personal interest in the subject of a transaction that might materially affect his judgment. As our Supreme Court said in Banes Estate, 452 Pa. 388, 395, 305 A. 2d 723 (1973):

"Here, there is no affirmative showing that the

trustee-creditor acted in bad faith or with fraudulent intent. But, as the Court said in Noonan Estate: 'Where there is self-dealing on the part of a fiduciary, it is immaterial to the question of his liability in the premises whether he acted without fradulent intent or whether the price received for his sale of trust property was fair and adequate: see Tracy v. Central Trust Company, 327 Pa. 77, 79, 192 A. 869, citing Everhart v. Searle, 71 Pa. 256, 260, where the following was approvingly quoted from Hare & Wallace's Notes, 1 Lead. Cases in Eq., p. 210, "It matters not that there was no fraud meditated and no injury done: the rule [forbidding self-dealing] is not intended to be remedial of actual wrong, but preventive of the possibility of it."' Id. at 32, 63 A. 2d at 84 (Emphasis added). See also Comerford Estate, 388 Pa. 278, 130 A. 2d 458 (1957); Restatement, Second, Trusts, §170 (1959)."

In Schmid v. Lancaster Ave. Theatre Co., 244 Pa. 373, 91 Atl. 363 (1914), our Supreme Court held that the rule against self-dealing which caused the interested directors to abstain from voting also applied to their two sons, and the votes of the latter in favor of their fathers' interests were so tainted with the same "substantial" self-interest as to nullify the effect of their votes.

The principles enunciated in these cases extend to a director or officer of a corporate trustee who is acting on behalf of a trust. A corporate trustee has the same fiduciary duties as an individual trustee, and a corporate trustee can only act through those individuals having the power to make decisions for the corporation. See Granger v. Pigott, 10 Dist. 327 (C.P. Phila. 1901).

Dow attempts to escape the impact of these principles by urging this court to apply the settlor-

created conflict rule. That rule provides that the absolute prohibition against even the appearance of self-dealing is mitigated where the settlor knowingly places his trustee in a position which the settlor knew would cause a conflict of interest for the trust or its beneficiaries. Dow's argument fails, because the issue which arose in the vote of August 16 and which gave rise to the appearance of conflict, cannot by any stretch be presumed to have been contemplated by the "settlor" of the Pew Memorial Trust, an essential prerequisite for the application of the doctrine. A new situation had been created by the 1969 Tax Reform Act of December 30, 1969, 83 Stat. 487, and the settlor, here, which was not a person but in actuality a foundation, had no contemplation of these new events; at least the record is totally bare of any evidence on that issue. The present case is controlled by Curtis Trust, supra, where it was held that although *certain* conflicts may have been contemplated by the settlor, the particular conflict at issue was not within the contemplation of the settlor and hence, the rule had no application.

There is no evidence in this record as to what the Pew Memorial Foundation, the settlor of this trust, was contemplating in 1957 at the time of its creation.

Furthermore, counsel has cited no authority in Pennsylvania for applying the settlor-created conflict doctrine to charitable trusts. Since charitable trusts are "pro bono publico" in the truest sense of the term, charitable trustees should be held to the highest fiduciary standards; they should not be excused from a standard simply because the settlor might have, had he canvassed all possible future events, realized that certain conflicts of interest

might arise. The highest fiduciary standard must be applied to the trustees of a charitable trust. Only the "might" test satisfies this goal.

### V. CLEAR VIOLATIONS BY DOW OF THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933 AND DOW'S CONSPIRACY WITH GENERAL CRUDE TO VIOLATE THE PROXY REQUIREMENTS OF THE SECURITIES EXCHANGE ACT OF 1934 WARRANTED THE TRUSTEE IN RESCINDING ITS AUGUST 16, 1974, LETTER.

The occasions are infrequent when a state court is called upon to resolve issues under the Federal securities laws. However, our Supreme Court has authorized our exercise of jurisdiction where the issues relate to questions of state law and policy: Davis v. Pennzoil, 438 Pa. 194, 209, 264 A. 2d 597, 605 (1970); accord, Jennings v. Boenning & Co., 482 F. 2d 1128, 1134 (3d Cir. 1973). Under the doctrine of Wilmington Trust, supra, and Binenstock, supra, it has been firmly established that where a trustee's agreement to sell has not become binding, it is the duty of the fiduciary to rescind his agreement in favor of a higher offer.

Both the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act") set out specific requirements for the sale of, and offers to sell, securities and for solicitation of shareholders' votes. Violations of these provisions allow the affected party to rescind any contract entered into following such violations.

Under section 5 of the Act of May 27, 1933, 48 Stat. 77, as amended, 15 U.S.C.A. _____, §77e, and Rule 145, 17 C.F.R. §230.145, it is unlawful to sell

any securities unless a registration statement is in effect, and it is equally unlawful to *offer to sell* any security before a registration statement has been filed.[9] Rule 145, which became effective on January 1, 1973, requires that a registration statement be filed with respect to transactions such as the proposed Dow-General Crude merger.[10]

As to proxies, section 14 of the Act of June 6, 1934, 48 Stat. 895, as amended, 15 U.S.C.A. §78n, proscribes any solicitation designed to secure a proxy, consent or authorization unless the person solicited has concurrently or previously been furnished with a written proxy statement containing the information specified in section 14A.[11]

It is stipulated here that no registration statement or proxy statement material had been filed with the Commission nor had any prospectus or formal proxy statement been furnished to Glenmede in advance of the board meetings on August 16 and September 4. (Stip. ¶¶64-65) Notwithstanding, Dow was offering to sell and selling its shares to Glenmede in violation of section 5 of the 1933 act, and General Crude, assisted by Dow, was soliciting Glenmede's vote in favor of the Dow merger proposal in violation of section 14 of the 1934 act.

Specifically, the following acts of Dow constitute violations of the 1933 act because they constituted a "sale" or "offer to sell" under section 2(3).[12]

Section 5(a) was violated because, under Dow's own theory, Dow sold its securities to Glenmede by entering into a contract with Glenmede on August 16, 1974, in the absence of either a filed or effective registration statement. Section 5(b) was violated by the circulation of the Dow August 15, 1974, memorandum (a "prospectus" within the meaning of the statute)[13] touting Dow as an investment. (T-

rial Ex. 42 b) (see Finding of Fact 62d) Section 5(c) of the 1933 Act was violated by Dow's offer to sell to Glenmede contained in the August 12 letter, and subsequent reiterations of the Dow offer. (Finding of Fact 62c) Additionally, Dow was fully aware of the extensive efforts made by representatives of General Crude in the evening of August 15, 1974, to persuade various members of the Board of Directors of Glenmede to support and vote for the Dow merger proposal. Instrumentalities of interstate commerce were used by Dow in that the August 15 memorandum, which was in fact a prospectus, was flown from Midland, Michigan, to Philadelphia, Pennsylvania, across state lines, and also telephone calls were used to set up the various meetings on August 15. (Finding of Fact 62b)

As to violations of section 14a of the 1934 act, the conduct of Messrs. Montague, Streetman, Pyle and Rosenwasser on the night of August 14, 1974, and Mr. Glanville's presentation to the Glenmede board on August 16, 1974, were non-exempt "solicitations" of a "proxy or consent or authorization." Rule 14A(1) defines a solicitation as activity designed to secure a proxy, consent or authorization. Mr. Montague's August 15, 1974, letter to the members of the Glenmede board concludes:

"In summary, I would like to repeat that the management and employees are united in recommending to you favorable consideration of the Dow proposal. . . . I have not made these recommendations to you in a frivolous or lighthearted manner. This Dow proposal is a serious one and I earnestly commend it to your favorable attention."(Trial Ex. 42) Thus, Mr. Montague's letter was a solicitation by its own terms. See Sargent v.

Genesco Inc., 492 F. 2d 750, 767-68 (5th Cir. 1974); Greater Iowa Corp. v. McLendon, 378 F. 2d 783, 796 (8th Cir. 1967). In Sargent, supra, the issue of solicitation is stated to be a question of fact and the auditing judge has so found (Finding of Fact 62a).

The consequences of Dow's violation of the registration provisions of the 1933 act and General Crude's violations of the proxy provisions of the 1934 act, with Dow's assistance, are that Glenmede was fully justified in its action on September 4, 1974, in rescinding any contractual relationship it may have had with Dow made in violation of the securities laws. See section 29(b) of the 1934 act, 15 U.S.C.A. §78cc(b).[14] See also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 386-88 (1970). Particularly with respect to liability of General Crude under section 14(a), the test is one of *negligence.* Glenmede thus does not have to show that General Crude, aided and abetted by Dow, *intended not to file* a statement, but rather that they were *merely negligent* in failing to do so. See, e.g., Gould v. American-Hawaiian Steamship Co., CCH Fed. Sec. L. Rep. ¶95,512 at 99,597 (3d Cir. 1976). Consequently, Glenmede's action on September 4, in selecting the IP $50 offer and submitting the matter to this court was entirely justified on the basis of violations of the securities laws by Dow and General Crude.

## VI.  THE IP OFFER OF $50 CASH IS SUPERIOR TO THE DOW OFFER OF $45 IN STOCK.

It is impossible for one to say at a glance that the various cash offers made by IP were superior to the Dow offer of stock because we are not dealing with fungibles. It is like comparing "apples with

oranges." Since Mr. Wesson of Smith Barney, Harris Upham, Dow's expert, so clearly illustrated this by his testimony before the auditing judge, the court has decided to admit his testimony over the objections by Glenmede and IP. When pressed, Mr. Wesson conceded that only when comparing the IP $47.50 proposal against the alternative of distributing one-seventh of the Dow stock annually, was he comparing "apples with apples" (Tr. 478-480); (Exs. 126, 128). And in this comparison, especially in light of Mr. Wesson's failure to consider the effect of the four percent excise tax, the immediate cash flow, and the disadvantages of distribution to the beneficiaries in kind, it is significant that Mr. Wesson conceded virtually no distinction existed between the two offers (Tr. 126). On August 16, Mr. Glanville of Lehman Brothers, investment banker advising General Crude, appeared before the Glenmede board and gave his opinion that the Dow stock offer at $45 was superior to the IP offers of $45 and $47.50 in cash. The board also had before it the opinion of Brown Brothers Harriman & Co. that IP's $45 and $47.50 offers were superior to Dow's $45 stock offer. Brown Brothers believed that Dow would have to *steadily* appreciate at an unrealistically high rate to equal the IP offer. It was not an easy problem for the Glenmede board to solve on August 16. The statement of Mr. J. N. Pew, III, to the board on September 4 details the many and varied reasons which determined his vote in favor of Dow (Ex. 110). The statements volunteered on the same occasion by Directors Horrocks, Sorlien and Guess show that their Dow votes were justified by the difficulty of comparing "apples with oranges." Under the circumstances, the auditing judge has decided that the vote favoring the Dow

offer was a business judgment, and not an unreasonable exercise of its discretion by the board. However, its finality must be recalled because of the substantial interest held by the Pew family in General Crude stock which might have caused them to vote the way they did.

After August 16, Glenmede received two separate legal opinions from counsel in Pittsburgh and Philadelphia that Glenmede should recall its acceptance of the Dow offer then reconsider that against the IP offer of $50 and submit its decision for the approval of the orphans' court. Glenmede received advice also from numerous financial advisors that IP's $47.50 and $50 offers were of greater value to the trust than Dow's $45 offer. These opinions emphasize the responsibility of a trustee of a charitable trust—that the trustee must preserve and protect trust assets by means of sound investment policy, among which are the maintenance of integrity of principal and the desirability of diversification. On August 19, Brown Brothers delivered a written opinion to Glenmede that in order for the Dow proposal to have a discounted present cash value to the trust equal to IP's three offers, Dow's stock would have to steadily appreciate 7 percent—9 percent to equal the IP $45 proposal, 8 percent—10 percent to equal the IP $47.50 proposal, and 9 percent—11 percent to equal the IP $50 offer, in each year between 1975 and 1982. Brown Brothers did not believe that Glenmede could safely rely on those appreciation rates and therefore concluded that the IP proposal had a greater value to the trust than the Dow proposal (Trial Exhibit 63, pp. 4-5). Nine days later, Brown Brothers concluded in an additional letter that the IP $50 proposal had a greater present cash value for the trust than the Dow proposal and that it would not be

prudent investment policy for the trust to rely on a 9 percent—11 percent compounded per annum rate of price appreciation for common stock over the next seven years (Stip. ¶106).

The Glenmede board was also furnished with copies of opinions comparing the Dow and IP proposals by Morgan, Stanley & Co. and First Boston Corporation, IP's investment bankers. It was Morgan Stanley's conclusion that the IP $50 offer was preferable for a charitable trust. It was the conclusion of the First Boston Corporation that even the prior IP offer of $47.50 would provide to the trust more opportunity for investment diversification, greater liquidity, and less risk than the Dow proposal (Stip. ¶105).

Thus three different investment advisors told Glenmede that IP's $47.50 and $50 offers would be of greater benefit to the trust. The only opinion of a financial advisor other than Mr. Wesson, that concluded in favor of Dow, was that of General Crude's investment advisor, Lehman Bros. Inc. Lehman Bros. found that the Dow offer of $45 in Dow stock was superior to IP's $47.50 cash and note proposal. Yet neither Mr. Wesson nor Lehman Bros. could bring themselves to say that the Dow offer was preferable to IP's $50 offer. The best they could muster was that the Dow offer was "comparable" to IP's $50 offer (Trial Ex. 88). Thus, no one has contended, and no creditable evidence has been introduced, that as of August 16, 1974, the Dow $45 offer was superior to the IP $50 offer.

The Attorney General of Pennsylvania met with the various counsel on August 30 and expressed the following ideas to counsel for Glenmede, inter alia: (1) the factors that must be considered in the choice between Dow and IP are those that show what is best for the trust, not General Crude; (2) in a situa-

tion involving the choice between an all-stock proposal and one involving cash and indebtedness, the trustee normally seeks cash and indebtedness, not stock speculation; (3) a trustee does not have the right to consider the impact on other shareholders—the fact that the minority shareholder would have to pay taxes was not persuasive; and (4) the "subject to" language could not be interpreted to be meaningless—it was placed there for some reason (Ex. 98; Stip. ¶113).

To the auditing judge, it is evident that in the face of the events that occurred late on August 16, 1974, Glenmede acted with the highest regard for established fiduciary principles. By accepting IP's $50 offer on September 4, Glenmede, as trustee, obtained the most advantageous terms for the sale of its General Crude stock. Not only was the price higher, but Glenmede also obtained the opportunity for significant diversification of its investment portfolio, as well as security of principal through receipt of a substantial initial cash payment and high quality debt securities, with yearly installment payments and a high fixed rate of interest. See the court's finding of fact no. 137(f), supra. Finally, because of the higher flow of income under the IP $50 proposal as compared to the Dow $45 stock offer, significantly more cash became available for immediate distribution to charities.

## VII.   BY THE EXPRESS TERMS OF ITS MERGER AGREEMENT WITH GENERAL CRUDE, DOW HAS NO CLAIM FOR BREACH OF CONTRACT AGAINST DOW.

At a board meeting on October 9, 1974, barely a month after this proceeding was instituted, Dow

decided to withdraw from the merger agreement and thereby terminate any further attempt to acquire the General Crude shares (Trial Ex. 113).

This voluntary action on Dow's part completely nullified its claims in this proceeding. Dow itself was the one which terminated this court's opportunity to decide the underlying issue of which party was entitled to purchase the trust's General Crude shares, and Dow's action in this regard undercuts completely its current argument that Glenmede and IP were the ones who caused Dow to lose the opportunity of acquiring the General Crude shares.

Dow attempts to sidestep this obvious fact by arguing that the uncertainty of litigation justified Dow's withdrawal from the merger agreement. The evidence, including the testimony of Mr. Gerstacker, Dow's chairman, makes clear, however, that Dow was considering withdrawing even before this proceeding was commenced, and, in light of the decline of the market price of Dow's stock, welcomed the opportunity to withdraw (Tr. pp. 81-84) (Gerstacker); (Trial Ex. AA).

Mr. Gerstacker, of Dow, listed five reasons for Dow's October 9 withdrawal action: (1) the length of time that would be involved in litigation; (2) the delay in getting oil; (3) the [untrustworthy] type of people he was dealing with; (4) the uncertainty of the stock market; and (5) the falling price of Dow stock, with the concomitant possibility that Dow might have to give away more Dow stock than it wanted to (Tr. 52-54, 93). Mr. Gerstacker could envision having to surrender one and one-half shares of Dow for each General Crude share as opposed to the two shares of Dow for three shares of General Crude originally agreed upon (Tr. 54).

The discussions that took place among the Dow hierarchy and the reasons for the decisions finally

reached are well illustrated by Mr. Barker's notes. At trial, Glenmede moved the introduction into evidence of Exhibits A, C, L, M, N, O, W, AA and DD, and IP pressed in addition for Exhibits J, K, Q, S, T, U, V, Z,. BB and CC. All of these documents are notes prepared by R. W. Barker, assistant general counsel to Dow. They record meetings and telephone conversations in which Mr. Barker participated. The auditing judge rules that the notes are admissible upon both of two independent grounds: (1) as business records; (2) as admissions against interest.

Mr. Barker was a witness in this proceeding. During his testimony he identified the exhibits listed above as his notes and stated that he prepared them at or shortly after the events recorded therein. He testified that it was his practice to make such records in the ordinary course of the performance of his duties as assistant general counsel. They became part of the files of the corporation and were produced from its files in response to demands for production made by the other parties in this proceeding.

The Uniform Business Records As Evidence Act of May 4, 1939, P.L. 42, 28 P.S. §91b, provides:

"A record of an act, condition or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

All of the criteria set forth in the act for the admission of records into evidence are satisfied with re-

gard to these notes. Mr. Barker testified to their "identity and the mode of [their] preparation." He also testified that they were made in the regular course of business "at or near the time of the act[s] . . . or event[s]" recorded therein. Clearly, "the sources of information, method and time of preparation" are sufficient to justify their admission. Attorneys' memoranda thus prepared are business records and admissible as such: Tracy v. Goldberg, 289 F. 2d 467, 470 (3d Cir. 1961), cert. den. 368 U.S. 828 (1961).

The notes also constitute admissions against interest. "Admissions are the words or acts of a party-opponent, or of his predecessor or representative, offered as evidence against him." McCormick on Evidence, §262 (2d ed. 1972). See IV Wigmore on Evidence, §1048 (1972).

The Pennsylvania courts have held that admissions are not only clearly admissible but "of high evidentiary value." Logue v. Gallagher, 133 Pa. Superior Ct. 570, 3 A. 2d 191 (1938). See also Heyman v. Hanauer, 302 Pa. 56, 152 Atl. 910 (1930). It is also clear that Glenmede and IP are not required to call Mr. Barker as a witness to explain these admissions although Dow has the opportunity to "offer [its] own explanation thereof and rebut [their] discrediting and damaging effect." 14 P.L.E. 520, §173, and cases cited therein.

As early as August 31, 1974, according to Mr. Barker's notes, Mr. Gerstacker was ". . . not happy . . . what if Dow's stock goes down to $30.00 . . . times have changed since we made the decision. . . ." Mr. Gerstacker felt ". . . It would be bad for Dow to make a deal if Dow's stock goes less than $60.00 . . ." (Trial Ex. AA). The closing price of Dow's stock on October 8, 1974, the day before Dow withdrew, was $53.25 (Stip. ¶143). These facts put

an end to Dow's argument that it withdrew because of the uncertainties of litigation. It also puts an end to Dow's claims against Glenmede and IP for allegedly depriving Dow of the supposed benefits of its bargain to acquire General Crude.

Significantly, the above were not the reasons which Dow assigned when its board of directors determined "pursuant to article 8.1(e) of the merger agreement [with General Crude] that the filing of said petition constitutes the institution of litigation, proceeding or investigation to restrain or prohibit the consummation of the transactions contemplated by the merger agreement. . . ."

Section 8.1 to which reference is made in Dow's October 9 resolution provides:

"8.1 Termination . . . this Agreement may be terminated at any time prior to the effective time of the merger, by:

"(e) Dow and GCO or General Crude if the Board of Directors of either Dow or General Crude shall have determined *in its sole discretion exercised in good faith* that the merger contemplated by this agreement has become inadvisable or impractical by reason of the threat or the institution of any litigation, proceeding or investigation to restrain or prohibit the consummation of the transactions contemplated by this agreement or to obtain other relief in connection with this agreement." (Emphasis supplied.)

The very next section, 8.2, provides: *"Effect of Termination:* In the event of the termination and abandonment of this agreement and the merger, this agreement shall become void and have no effect, *without any liability* on the part of any party or its directors, officers or *stockholders. . . ."* (Emphasis supplied.)

Since Glenmede is not only a stockholder but a major stockholder of General Crude, it is inescapable that this action by Dow effectively concludes the August 16 transaction "without any liability on the part of . . . the stockholders" of General Crude, including, of course, the Pew Memorial Trust.[15]

## VIII.  DOW'S CLAIMS FOR DAMAGES ARE WITHOUT MERIT

Dow has asked this court to find Glenmede liable to Dow for breach of contract. Dow also asks the court to find Glenmede and IP liable to Dow for "tortious interference" with Dow's contractual rights. In paragraph 3 of its "New Matter," Dow has averred that Glenmede's officers (Allyn R. Bell, Jr., and Augustus S. Ballard, Esq.), IP, "and others" committed "tortious interference" with Dow's contractual rights in that they "caused Glenmede to breach its agreement on behalf of the Pew Memorial Trust with defendant Dow by among other things voting to approve an offer of IP to purchase the shares of stock of General Crude held by Glenmede as Trustee of the Pew Memorial Trust and entering into an agreement with IP to sell such shares."

A subsidiary but important issue which arose during the trial requires discussion. IP has designated portions of the deposition of John G. Harkins, Jr., Esq., for introduction into evidence (Tr. 752). Counsel for Dow objected because Mr. Harkins was acting as trial counsel for Glenmede. No objection was raised to the deposition of Augustus Ballard, Esq., who is a partner with Mr. Harkins in the law firm of Pepper, Hamilton & Scheetz. Mr. Miller, for Dow conceded that Mr. Ballard's testimony was being offered on his deposition as an officer of

Glenmede which is independently admissible as the testimony of a party.

Dow argues that, if Mr. Harkins' deposition is to be introduced by IP, he should have disqualified himself as trial counsel. As authority for its position, Dow cites the code of professional responsibility to the effect that a lawyer should withdraw as trial counsel if he is to be called as a witness on behalf of his client—which is not applicable here. Dow omits that portion of the code of professional responsibility that does specifically govern here— the rule applicable where the lawyer is called by *another* party: "(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm *may be called as a witness other than on behalf of his client,* he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client." (Emphasis supplied.) D.R. 5-102(B). Our Supreme Court, in Otto Will, 349 Pa. 205, 211, 36 A. 2d 797 (1944), acknowledged this exception when an adverse party puts the lawyer on the stand as a witness.

Dow is the one which noticed and took Mr. Harkins' deposition. The deposition itself shows that Dow freely cross-examined Mr. Harkins while he was a witness. Leading questions were put on all crucial issues. IP is the one which has offered the deposition into evidence. Since Glenmede assured the court on the trial that Glenmede, itself, would not make use of Mr. Harkins' deposition, the court ruled at that time that IP might make use of the disputed deposition. Glenmede has been true to its word and neither in its briefs nor in its requested findings of facts has it made any reference to the deposition of its trial counsel.

Dow also cites Pa.R.C.P. 4020 to the effect that a non-party deposition may not be substituted for oral testimony where the witness is in the courtroom. Dow misconceives the understanding on which this case proceeded to trial. It was agreed that deposition testimony would be designated and offered without regard to oral testimony. Thus, Dow, itself, has designated portions of the depositions of Messrs. Ballard, Bell, Monge and Gerstacker, although these gentlemen were either in the courtroom or actually testifying. When the court inquired on the first day of trial whether any members of the firms represented herein were to be called as witnesses, the fact that both Mr. Harkins' and Mr. Ballard's depositions were to be used by IP was called to the court's attention. At that time, Dow's counsel made no objection nor was reference made to any alleged understanding that would separate or distinguish the deposition of Mr. Harkins from that of Mr. Ballard. Glenmede has designated ample evidence taken from the depositions and testimony of other witnesses on which to base its arguments and its proffered findings of fact. It does not need the deposition of Mr. Harkins nor has it made any effort to rely on it. On the other hand, IP is entitled in its defense to Dow's claim for damages to rely on the deposition of an important witness who was noticed by Dow but in whose testimony Dow can find no aid nor comfort.

For the above reasons, the auditing judge believes that his ruling on the trial (Tr. 762) was proper.

Dow bases its claim of breach of contract on the August 16, 1974, letter delivered by Messrs. Bell and Ballard to the Dow representative. Dow's position is that the making by IP, and the acceptance by

Glenmede, of a higher offer for the trust's General Crude shares constitute a "tortious interference" with Dow's contractual rights. However, Dow cannot square this claim with the basic facts, namely:—(i) IP made its higher offer for the trust's General Crude shares *before* the letter of August 16, 1974, was executed or delivered to Dow; (ii) Glenmede advised Dow prior to the delivery of the August 16 letter of the pendency of IP's higher offer; (iii) Glenmede provided in the letter itself for the possibility that as a trustee, Glenmede might be compelled by its fiduciary obligations to accept IP's higher offer.

Apparently recognizing the weakness of its claims, Dow, on the eve of trial, made a motion to amend its pleadings to advance another claim. This belated claim is that Glenmede and/or IP are liable for interference with Dow's "prospect" of entering into a contract to acquire the trust's General Crude shares.

The court reserved its ruling on Dow's offer to file an amended answer. Since in Pennsylvania the right of amendment of pleadings is liberally granted, and we are satisfied that IP and Glenmede will not suffer thereby, we now allow the amendment: Snoparsky v. Baer, 439 Pa. 140, 145, 266 A. 2d 707 (1970).

Dow's claim of tortious interference with its "prospective contractual relation" with the trust can be dismissed at the outset. Dow's claim rests upon the contention that even though Dow had no contract with Glenmede to acquire the General Crude shares, its proposal to the trust was entitled to the legal protection afforded a contract, and IP was precluded from making, and Glenmede from accepting, a higher offer for the trust's shares. This

contention is hopelessly unsound as a matter of law. Dow loses sight of the basic fact that a charitable trust is involved here. Dow's claim, if allowed, would establish the proposition that a trustee may be precluded from accepting a higher offer for trust assets even *before* the trustee has entered into a contract to sell them. Such a proposition flies squarely in the face of long-standing principles of trust law. It is elementary law, as we have established above, that a fiduciary such as a trustee *must* accept a higher price offered for trust assets if the offer is received prior to his entry into a binding contract: Warfel Estate, supra; Heilig Bros. Co., Inc. v. Kohler, supra; Herbert Estate, supra.

Dow's suggestion is also unsound as a matter of policy as well as law. A trustee should never be bound by some offeror's alleged "prospect" of entering into a contract with a trust; the trustee should not be bound until the trustee enters a contract. Parties seeking to buy assets from a trust should be free, until a trustee has entered a contract, to bid for the trust assets without fear of claims of tortious interference from someone else's "prospect" of acquiring them. A contrary rule would cause confusion and uncertainty and would chill, if not stifle, the open competition that often leads to maximizing a consideration received by a trust for its assets.

Even in commercial dealings, the idea that a party may have a "prospective contractual relation" with another that is entitled to protection from interference is a concept that has been very sparingly applied. See Glenn v. Point Park College, 441 Pa. 474, 272 A. 2d 895 (1971). Furthermore, our Supreme Court has expressly held that where two parties are seeking to acquire stock owned by a third, they are in competition and until a contract to

sell the stock is entered into, the privilege to compete authorizes each of the parties to take any competitive step to acquire the stock including raising his bid. Even in a purely commercial setting, the law recognizes no liability in this situation for interference with another party's "prospective contractual relation." This was the holding in Neel v. Allegheny County Memorial Park, 391 Pa. 354, 137 A. 2d 785 (1958).

At the outset, we set forth the basic legal elements of a claim of "tortious interference." "Tortious interference" is defined in §766 of the Restatement, Torts, as follows: ". . . [O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another . . . is liable to the other for the harm caused thereby."

The Pennsylvania Supreme Court has adopted this Restatement definition: Glenn v. Point Park College, supra at 479-480; Birl v. Philadelphia Electric Co., 402 Pa. 297, 167 A. 2d 472 (1960). The court has held that there are four essential elements of a cause of action for tortious interference, *each* of which must be alleged and proved before liability will arise:

(1) The existence of a contract or such "prospective contractual relation" as is entitled to legal protection;

(2) A purpose or intention on the part of the defendant to interfere with it;

(3) The absence of any privilege for the defendant's conduct; and

(4) The occurrence of harm as a result of the defendant's conduct.

Dow has the burden of proof on each one of these four elements, every one of which must be estab-

lished in order for Dow to be entitled to a judgment in its favor.

By what we have said above, we have already established that the August 16 letter did not create a valid or enforceable agreement in favor of Dow and against Glenmede. We have also shown that there was no purpose or intention on the part of IP to interfere with the alleged contract because Glenmede's officers and counsel had just informed IP before it made its $50 offer that Glenmede was not yet bound to Dow: (Harkins dep. pp. 27, 28, 32, 37-38; Flom dep. pp. 25-26; Greenhill dep. pp. 73-74, 76-77).

There can be no question that IP was a privileged competitor for the purchase of the General Crude stock. Pennsylvania recognizes three distinct privileges which are pertinent here:

(a) A privilege to compete, Restatement, Torts, §768; Neel v. Allegheny Memorial Park, supra;

(b) A privilege to urge non-performance of a contract which is against public policy, Restatement, Torts, §774; Albee Homes, Inc. v. Caddie Homes, Inc., 417 Pa. 177 (1965); and

(c) A privilege to solicit action by a governmental body, Restatement, Torts, §767(a); Vanarsdale v. Laverty, 69 Pa. 103 (1871).

Section 767 of the Restatement, Torts, points to the public interest in protecting a particular contract as a major factor to be considered in whether tortious interference with a contract has occurred. If the public interest in protecting a contract is inferior to the public interest in protecting the actor's freedom of action, no tortious interference will be found. Id. §767(a); Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp., 325 F. 2d 2 (3d Cir. 1963); Glenn v. Point Park College, supra.

The August 16 letter between Dow and Glenmede was not in the public interest and should therefore weigh very lightly when balanced against the public interest in protecting both IP's freedom of action as a competitor and the Pew Memorial Trust's freedom to improve its financial position. Dow's alleged agreement with Glenmede was procured in violation of the securities laws, approved by at least three votes tainted by self-dealing, and if approved by this court would constitute a breach of trust by the Glenmede board.

IP's status as a competitor, and the correlative public interest in protecting competition, alone outweigh Dow's interest in an invalid and unenforceable letter: Kademenos v. Equitable Life Assurance Soc., 513 F. 2d 1073, 1077 (3d Cir. 1975). Furthermore, the public interest in protecting the beneficiaries of the trust, through insuring that the trust obtain the best possible price for the General Crude stock would also alone outweigh any public interest in protecting the August 16 letter.

In order to establish liability on IP's part for "tortious interference," the burden is on Dow to establish that Glenmede's withdrawal from its conditional agreement to support Dow's merger proposal would not have occurred "but for" actions by IP which are found to be acts of tortious interference: Keifer v. Cramer, 356 Pa. 96, 51 A. 2d 694 (1947). This Dow has failed to do.

On the contrary, Glenmede withdrew from the alleged agreement with Dow as a result of overwhelming legal, financial and governmental advice that it could and should do so given the existence of IP's $47.50 and $50 offers. Since these two IP offers clearly did not constitute acts of tortious interference in that they arose prior to the time any

alleged contract was in existence, were not intended to interfere with an existing contractual relationship, and were clearly privileged, Dow cannot establish the necessary causation.

The Attorney General of Pennsylvania had expressed concern over the apparent difference in value to the trust of the Dow and IP offers, the prudence of placing one-third of a trust's assets in a single stock, and the possible personal motivation of directors of Glenmede which conflicted with their fiduciary responsibility (Trial Exhibit 75, pp. 2, 3). As the result of an August 30 meeting, Glenmede's counsel concluded that if Glenmede decided to stay with the Dow agreement, Glenmede would have to make a convincing explanation to the Attorney General as to how the Dow acceptance could be justified under the so-called "Prudent Man Rule" (Stip. ¶113).

There is one final point directly relevant to the issue of whether actions by Glenmede or by IP tortiously caused harm to Dow. Glenmede did not simply withdraw from the condition of commitment, — *but at the very same time,* Glenmede commenced this proceeding to obtain a judicial determination of the rights of all the parties. IP was willing to permit this court to decide the destiny of the trust's General Crude shares despite the fact that a third entirely new party could have entered the bidding and obtained them (Tr. 869 [Monge]). Dow, on the other hand, was not willing to leave the question to judicial determination although its cooperation had been requested by Glenmede (Harkins' dep. 67). Instead of cooperating in obtaining such a ruling, Dow took matters into its own hands by unilaterally abandoning its merger agreement with General Crude.

## IX. TRUSTEE'S COMPENSATION AND COUNSEL FEES

On page 14 of the account, it is noted that counsel has taken credit for payment of counsel fee, with regard to the sale of the General Crude stock, in the amount of $178,787.01. In addition thereto, counsel has advised us that the trustee, as compensation for extraordinary services, has received a payment on account in the amount of $50,000 on February 28, 1975, and an identical payment on account on August 28, 1975, or a total to date of $100,000.

In addition thereto, page 2 of the account notes that the principal balance for distribution is subject to (1) "payment of compensation to trustee for extraordinary services rendered in connection with the sale of General Crude stock and litigation arising out of such sale," and (2) "subject to payment of the remainder of the counsel fee for services relating to the sale of General Crude stock, litigation arising out of such sale and the filing of this Account."

James W. Sutton, Jr., Esq., Deputy Attorney General for the Commonwealth of Pennsylvania, has indicated that he reserves the right to object to counsel fee relating to the litigation of the Dow claims until the outcome of this litigation.

In view of Mr. Sutton's objections, we cannot, and will not, approve any additional counsel fee nor commissions at this time. Counsel are directed to submit a petition to the auditing judge setting forth counsel's and trustee's request for the additional compensation. At that time a full hearing will be held to consider those claims.

We will, however, approve the $100,000 paid to trustee on account as stated above, and the pay-

ment on account of counsel fee of $178,787.01, without prejudice to the right of the trustee and counsel to claim additional compensation at a later date.

And now, June 30, 1977, the account is confirmed nisi.

---

1. Jurisdiction is conferred upon this court pursuant to sections 711(3), 712(3), 715, 3353 and 7133(16) of the Probate, Estates and Fiduciaries Code of June 30, 1972, P.L. 508, as amended, 20 Pa.C.S.A. §§711(3), 715, 3353 and 7133(16), and pursuant to section 16 of the Pennsylvania Uniform Declaratory Judgments Act of June 18, 1923, P.L. 840, 12 P.S. §831. The court has fully set forth its reasons for accepting jurisdiction in a separate opinion filed this day in which it overrules Dow's objections to Glenmede's petition for a declaratory judgment.

2. On page 3 of their post-trial brief, counsel for Glenmede have aprraised the Pew Memorial Turst as "the largest of Pennsylvania's charitable trusts."

3. Concurrently, the parties identified and stipulated the authenticity and admissibility of 116 exhibits for trial. Additionally, "authenticated documents A through EE" were submitted to the court for its consideration if the court should approve their admissibility.

4. Individuals and firms to whom reference is made in this adjudication are: *GLENMEDE* — Allyn R. Bell, Jr., president, director, also director of General Crude; August S. Ballard, secretary and a partner at Pepper, Hamilton & Scheetz; Robert G. Dunlop, Howard Guess, Thomas S. Horrocks, John G. Pew, Sr., John G. Pew, Jr., Joseph N. Pew, III, Richard C. Sorlien and Ethel Benson ("Peppi") Wister, all directors; John G. Harkins, Jr., partner at Pepper, Hamilton & Scheetz; Brown Brothers Harriman, investment bankers advising Glenmede. *DOW CHEMICAL COMPANY* — Carl A. Gerstacker, chairman

of the Board; Paul F. Oreffice, financial vice-president; R. W. Barker, asst. general counsel, asst. secretary; William A. Groening, vice-president, chief general counsel; Bruce R. ("Toby") Wesson of Smith Barney, Harris Upham, investment bankers advising Dow. *INTERNATIONAL PAPER COMPANY*—Joseph P. Monge, vice-chairman; Robert Greenhill of Morgan Stanley, investment banker advising IP; Joseph H. Flom, counsel to Morgan Stanley; First Boston, investment banker advising IP. *GENERAL CRUDE OIL COMPANY*—Kenneth E. Montague, president, director; Michael Rosenwasser, partner at Andrews, Kirth, Campbell & Jones, counsel to General Crude; James W. Glanville, of Lehman Bros., investment banker advising General Crude.

5. Mr. Monge, true to his promise on August 16, confirmed his $50 offer in writing on August 18. In addition, he formally communicated with the Honorable Israel Packel, Attorney General of Pennsylvania, complaining that the Glenmede Trust Company had failed in its fiduciary obligation by not accepting the superior offer of IP for the purchase of a major asset of the charitable trust. In meetings with various parties over the next several days, the Attorney General demanded an explanation of why an offer of cash and notes of $50 or even $47.50, was not superior to an offer of stock at $45. In the meantime, Dow had issued public statements to the effect that it had a binding agreement with Pew Memorial Trust.

6. Although Dow disputes precisely what it was told about the IP offer, Dow cannot dispute that the offer was actually made then and there on August 16. No Dow representative was in attendance at the time Mr. Monge made the offer; and Messrs. Bell, Ballard, Monge, Flom and Greenhill, all of whom were present, are firm in their testimony that Mr. Monge, at the second meeting of IP and Glenmede representatives, made an *oral offer* to Glenmede of *$50 per share* of General Crude to be confirmed in writing by August 19, 1974. (Tr. 636-38, 666-70, 787-90, 828-30, 843; Exs. 53, 59; Bell dep. at 138-39; Ballard dep. at 139, 145; Monge dep. at 119-20; Flom dep. at 26-27; Greenhill dep. at 74-75.) Despite intensive cross-examination at both deposition and trial, Dow has been unable to cast any doubt on the actuality of that offer. *Mr. Monge swears he made it, Messrs. Ballard and Bell, as well as other witnesses, swear they heard it,* and no credible evidence has been presented that

the offer did not occur. The deposition of Mr. Harkins (p. 31), while not necessary for this finding of fact, very definitely confirms its accuracy. Dow took Mr. Harkins' deposition and IP alone has offered it in evidence and relied on it. For reasons stated below, the auditing judge has overruled Dow's objection to its admissibility. The overwhelming weight of the evidence establishes disclosure to Dow of the IP offer. Mr. Bell has stated unequivocally that Mr. Ballard made full disclosure of the existence of the offer, and Mr. Ballard's deposition and contemporaneous memorandum reiterate the point. (Tr. 636, 638, 666-70; Ex. 53; Bell dep. at 154-57; Ballard dep. at 146-58.) Dow's attempt to contradict the actuality of these communications falls short of the mark. Mr. Gerstacker might have cast some light on the next event, but, in fact, did not. At the critical moment when Mr. Ballard, according to Dow's own Mr. Barker, was taking pains to explain the problems created by IP's actions after adjournment of the Glenmede Board meeting but prior to Glenmede's delivery of its letter to Dow, Mr. Gerstacker paid no attention, considering these issues "details." (Tr. 79; Ex. 50.) He has no idea what Messrs. Ballard and Barker said to each other. Mr. Gerstacker is not a lawyer. His testimony before the auditing judge evinces a total lack of appreciation of the vendor's responsibility as the trustee of a charitable trust. Mr. Gerstacker viewed their conversation as a "side conversation" of lawyers. (Tr. 77-78, 148-151.) When pressed, Mr. Gerstacker candidly conceded that he has utterly no idea what Mr. Ballard and Mr. Barker "might have said to each other." (Tr. 78.) According to his own testimony, the only person who told Mr. Gerstacker that Dow had a "binding agreement" was Mr. Barker (Tr. 78-79.) Mr. Ballard and Mr. Bell "said nothing." (Tr. 156.) Mr. Barker's testimony and his memorandum (Ex. 50) *confirm* Messrs. Ballard's and Bell's account of the conversation in large part. He admits that Mr. Ballard discussed an IP offer of $50.00 per share, but claims Mr. Ballard did not make clear it was a present offer; rather, he recalls it being said that IP *intended* to make an offer of $50.00. (Tr. 267-70.) His admission that a firm price of $50.00 was mentioned is significant. He *concedes* that the "subject to" language was inserted for that reason. (Tr. 268-70.) Under these circumstances, adoption by the auditing judge of the above findings of fact, No. 80d through 80h is clearly warranted.

7. 40a. Dow desired a stock-for-stock exchange in order to obtain pooling of interest treatment of the transaction, thereby avoiding dilution of Dow's earnings (Tr. 114-17) and also in an effort to make the transaction particularly attractive to those General Crude shareholders who would benefit from a tax free transaction. (Tr. 114-17, 330-32; Oreffice dep. at 76-79.)

62a. On August 15 and 16, 1974, with the knowledge and approval of Dow, both Mr. Montague on behalf of the management of General Crude and other General Crude representatives, solicited the consent and support of each Glenmede Board member for their vote in favor of Glenmede committing its shares to approve the Dow-General Crude merger agreement. (Tr. 255-57, 259-60, 262, 358; Exs. M, N.) The consents were solicited through letters delivered in Dow envelopes dated August 15, 1974, from Mr. Montague, General Crude's President, to the members of the Glenmede Board, as well as through personal visits paid upon certain Glenmede Board members by General Crude representatives on August 15, 1974. (Tr. 259-260-262, 357-58, 611-14; Ex. 52; Oreffice dep. at 273-74; Rosenwasser dep. at 48-54; Ballard dep. at 380-83.)

62b. Means and instrumentalities of interstate commerce were used by both Dow and General Crude to transfer the offer, and the package of materials contained in Exs. 35, 42 and 47 to the Glenmede Board. (Tr. 259-60; Rosenwasser dep. at 49-50.)

62c. The Dow August 12, 1974, letter to Glenmede (Ex. 35) was an "offer to sell" pursuant to section 2(3) of the Securities Act of 1933, 15 U.S.C.A. §77b(3).

62d. The package of materials prepared for the Glenmede Board members by Dow and General Crude (Ex. 47), contained material that was "persuasive, complete, interesting," in an attempt to "come up with a good approach to Glenmede to let them know the good things about Dow," and hence was a "prospectus" as the term is defined under section 2(10) of the 1933 Securities Act, 15 U.S.C.A. §77b(10). (Tr. 255-59-262.)

120a. The Attorney General of Pennsylvania, the Honorable Israel Packel, at all relevant times favored the IP $50 offer of cash and notes over the Dow $45 stock offer, and also approved of the matter being submitted to the orphans' court for resolution. (Tr. 372-74; Exs. 104, AA.)

129a. Because of the holdings in General Crude stock of Jack Pew, Sr., Joseph N. Pew, III, and the members of Joseph N. Pew, III's family, as well as the tax free nature of the Dow $45 offer as opposed to the IP $47.50 offer, sufficient substantial personal interest existed in the subject of the transaction

that the judgment of these directors might have been affected. (Tr. 631-32, 653.)

135a. In fulfillment of its fiduciary responsibilities, after the events of August 16, 1974, Glenmede at once consulted with counsel, and the situation was intensely analyzed. By September 4, 1974, counsel concluded that Glenmede should consider the IP $50 offer, compare it with the Dow $45 offer, choose whichever it deemed best fulfilled the trust's needs, and submit its action to the orphans' court for approval. (Tr. 648-53, 656-58, 897-99; Exs. 99, 105.)

135b. The actions of the Glenmede board on September 4, 1974, in withdrawing from whatever Glenmede's obligation to Dow might have been and then considering both the Dow $45 and IP $50 offers, and selecting the IP $50 offer as being preferable in light of the needs of the trust were all subject to orphans' court approval. (Tr. 650-53, 897-99; Ex. 110.)

135c. On September 4, 1974, both Dow and IP fully understood that the Glenmede board was considering both offers, that Glenmede's choice would be subject to orphans' court approval, that the orphans' court could find for either Dow or IP, and that Glenmede would be bound by the court's decision. (Tr. 291-92, 392, 800, 859-60, 863, 865-66, 868-70.)

137a. No certainty existed as to when the proposed Dow-General Crude merger agreement would be consummated. The closing date could have been at least as late as January, 1975, depending on the rulings of the United States Securities and Exchange Commission, the Internal Revenue Service, and the Canadian Foreign Investment Review Agency. (Tr. 295-96.)

137b. Dow had no need for General Crude's oil for at least two years subsequent to August, 1974. (Tr. 402-03; Ex. AA.)

137d. Distributions of restricted stock in kind by Glenmede to small or unsophisticated charities cause numerous problems to those donees, including, inter alia, the necessity for attorneys' opinions, and compliance with the regulations of the United States Securities and Exchange Commission and the New York Stock Exchange. (Tr. 579-80.)

137e. As of August 16, 1974, based on information before the board of Glenmede or available to them and confirmed by subsequent expert testimony, the Dow $45 stock proposal and the IP $47.50 cash and notes offer were of substantially equivalent value to the trust. (Tr. 483-84; Exs. D. 126, D. 128.)

137f. On September 4, 1974, the IP offer of $50 in cash and notes, $10 down and the remainder in 9½ percent 7-year notes,

was higher and of more value to the trust in light of its needs than the Dow $45 stock offer. (Tr. 578-80; 650-51, 887-88; Exs. 63, 87, 97.)

8. Even Dow's Mr. Barker appreciated the difficult problem faced by the trustees. As of August 28, Dow had considered a suit for specific performance to compel the trustees to carry out the board resolution of August ·16. In discussing Dow's decision not to institute suit until after the September 4 meeting, Mr. Barker stated: "Right. We decided not to pressure the Glenmede trustees by instituting litigation, but to let them work out this very difficult question with which they are confronted and which they have not asked for." (Tr. 392.)

9. Section 5 of the 1933 Act provides:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

"(b) It shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or

"(2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

"(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medim of any prospectus or otherwise any security, unless a registration

statement has been filed as to such security, or while the regis-
tration statement is the subject of a refusal order or stop order
or (prior to the effective date of the registration statement) any
public proceeding or examination under section 77h of this
title."

10. SEC Securities Act Release No. 5316 (October 6, 1972)
announced Rule 145 which required that certain previously
exempt transactions be registered.

The rule provides, in relevant part:

"(a) Transactions within this section. An 'offer,' 'offer to
sell,' 'offer for sale,' or 'sale' shall be deemed to be involved,
within the meaning of section 2(3) of the Act, so far as the
security holders of a corporation or other person are concerned
where, pursuant to statutory provisions of the jurisdiction
under which such corporation or other person is organized, or
pursuant to provisions contained in its certificate of incorpora-
tion or similar controlling instruments, or otherwise, there is
submitted for the vote or consent of such security holders a plan
or agreement for—

"...

"(2) Mergers or consolidations. A statutory merger or con-
solidation or similar plan or acquisition in which securities of
such corporation or other person held by such security holders
will become or be exchanged for securities of any other person,
except where the sole purpose of the transaction is to change an
issuer's domicile; or . . ." 17 C.F.R. §230.145.

The Dow-General Crude Merger came within the rule be-
cause the merger agreement was a "statutory merger or con-
solidation or similar plan of acquisition." Pursuant to section
251 of the Delaware Corporation Law, the merger would have
been submitted to shareholders of General Crude and GCO
Merger Corporation, a Dow subsidiary. Registration should
have been accomplished by the filing of a form S-14 and a
prospectus would have had to have been delivered to security
holders whose consent was solicited twenty days prior to the
meeting. In this case, the prospectus requirement would have
been satisfied by the Form 14A proxy statement (a "wrap
around" registration) which Dow also did not prepare or de-
liver. See generally C. Schneider and J. Manko, Rule 145: An
Analysis and Appraisal, 5 Rev. Sec. Reg. 81 (1972), 6 Rev. Sec.
Reg. 1 (1973); A. Borden, Federal Securities Law, Business
Acquisitions: Planning & Practice, 377-440 (J. Herz and C.
Baller eds. 1971).

11. Section 14(a) provides, in relevant part:

"It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name or solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C.A. §78n(a)

12. Section 2(3) provides, in relevant part:

"The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value. The term 'offer to sell,' 'offer for sale,' or 'offer' shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value. The terms defined in this paragraph and the term 'offer to buy' as used in subsection (c) of section 77e shall not include preliminary negotiations or agreements between an issuer (or any person directly or indirectly controlling or controlled by an issuer, or under direct or indirect common control with an issuer) and any underwriter or among underwriters who are or are to be in privity of contract with an issuer (or any person directly or indirectly controlling or controlled by an issuer, or under direct or indirect common control with an issuer)." 15 U.S.C.A. §77b(3)

13. 15 U.S.C.A. §77b(10). See Rule 145(b), 17 C.F.R. §230.145(b). The courts have taken a broad view of the concept of prospectus, e.g., Harper v. U.S., 143 F. 2d 795 (8th Cir. 1944) (telegram); In The Matter of Axe Securities Corp., 42 S.E.C. 381 (1964) (book article).

14. Section 29(b) of the 1934 act provides, in relevant part:

"Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision,

rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation." 15 U.S.C.A. §78cc(b).

15. If one attempts to separate Glenmede's August 16 letter from the merger agreement on the theory that the letter gave rise to a separate contract, then it must be considered a unilateral contract, one in which on the strength of Dow promises already made, Glenmede promised future action in the sense of voting its shares in support of the merger. Pursuing this argument, then Glenmede's actions on September 4 can be considered nothing more than an anticipatory breach, for no shareholders' meeting at which Glenmede could vote its shares had yet occurred, nor even been scheduled. The law is clear that there can be no anticipatory breach of a unilateral contract. In Restatement, Contracts, §318e (1948), we read:

"The doctrine of anticipatory breach is not extended to unilateral contracts unless the promisor's duty is conditional on receipt by him at some time subsequent to the repudiation of the agreed exchange of his promise or performance. The mere happening or performance of a condition is not enough, unless the performance is part of the agreed exchange of performances in the transaction, even though it is not promised . . . No breach can arise out of a unilateral contract before the time fixed for performance, whether the contract was originally unilateral or has become so by the performance of one party." See also Restatement, 2d, Contracts, §277(1) (Supp. Tent. draft Nos. 8-9 1973-1974).

In Merrick v. Allstate Insurance Co., 349 F. 2d 279 (8th Cir. 1965) (Opinion by Blackmun, *J.*), plaintiff was seeking to have an insurance company's refusal to make a particular payment declared an anticipatory breach with the result that future payments would be accelerated, and plaintiff would be relieved of the necessity of bringing a continuous series of suits. The 8th Circuit, however, affirmed the lower court in finding that the contract was executory on one side only, and there could be no actionable anticipatory breach.

Another objection to Dow's view of the August 16 letter as

an entirely separate contract is that it would be unenforceable as an *option*. It has long been the rule that a trustee cannot grant an option unless a specific provision in the governing instrument so provides: Moore v. Trainer, 252 Pa. 367, 370-71, 97 Atl. 462, 464 (1916); Hickok v. Still, 168 Pa. 155, 157, 31 Atl. 1100-1101 (1895), and the common law rule has been codified, 20 Pa.C.S.A. §7133(17). This trust is silent on the subject.

Actually, the August 16, 1974, letter cannot be separated from the merger agreement. Glenmede's commitment to vote was a condition of the merger agreement. The foundation of Dow's entire claim is that merger agreement. Dow was attempting to acquire an oil company, including Glenmede's interest, through a merger. In contrast to the IP offer, Dow's acquisition proposal was not structured as a direct contract with Glenmede for the purchase of the 63 percent of General Crude common shares held by the trust. Not at all. Dow, for practical business reasons, wanted a tax-free merger (Tr. 114-17).